**In re Application of THE HERALD COMPANY, Applicant-Appellant.**

**UNITED STATES of America, Plaintiff,**

v.

**Michael KLEPFER, Defendant-Appellee.**

**No. 726, Docket 83–7985.**

United States Court of Appeals, Second Circuit.

Argued Jan. 3, 1984.

Decided April 24, 1984.

S. Paul Battaglia, Syracuse, N.Y. (Edward Ryan Conan, Bond, Schoeneck & King, Syracuse, N.Y., on the brief), for applicant-appellant.

Sal Cognetti, Jr., Scranton, Pa. (Bour, Gallagher, Foley & Cognetti, Scranton, Pa., on the brief), for defendant-appellee.

James C. Goodale, John G. Koeltl, Gary W. Kubek, Debevoise & Plimpton, Katherine P. Darrow, George Freeman, Michael B. Mukasey, Patterson, Belknap, Webb & Tyler, New York City, Alice Neil Lucan, Rochester, N.Y., submitted a brief for amici curiae The N.Y. Times Co., N.Y. News, Inc., and Gannett Co., Inc.

Before NEWMAN and WINTER, Circuit Judges, and MacMAHON, District Judge.*

JON O. NEWMAN, Circuit Judge:

This appeal requires consideration of the substantive standard to be applied and the procedure to be followed in adjudicating a defendant's request to exclude the public from a pretrial hearing—in this case a hearing on a motion to suppress evidence. The Herald Company, publisher of the *Syracuse Post Standard*, appeals from the October 13 and November 9, 1983, orders of the District Court for the Northern District of New York (Howard G. Munson, Chief Judge) ordering the closing of the courtroom during the pretrial hearing of a motion to suppress made by defendant Mi-

---

* The Honorable Lloyd F. MacMahon of the United States District Court for the Southern District of New York, sitting by designation.

chael Klepfer. Klepfer was indicted on March 17, 1983, on charges of making false statements to Government investigators and thereby obstructing justice, in violation of 18 U.S.C. §§ 1001, 1503 (1982). We remand for further consideration by the District Court.

### Background

The charges against Klepfer stem from an investigation begun in December 1980 by the Federal Bureau of Investigation into the background and qualifications of Raymond J. Donovan, President Reagan's nominee for Secretary of Labor. Thereafter, a Special Prosecutor was appointed to investigate allegations that Donovan, prior to his appointment as Secretary, had committed violations of federal law. On June 11, 1982, a witness in the investigation conducted by the Special Prosecutor was murdered. The indictment in this case charged that Klepfer had made false statements concerning Donovan to both the FBI and the Special Prosecutor. It also charged that he had falsely stated that the witness was murdered to prevent his revelation of an alleged scheme whereby a $20 million campaign contribution would be made by the International Brotherhood of Teamsters in return for Donovan's recommendation of presidential pardons for Russell Bufalino, a reputed organized crime figure, and Anthony Provenzano, a former Teamster official.

On April 28, 1983, Klepfer filed several motions, including a motion to suppress all oral statements made to federal investigators between January 21, 1981, and March 17, 1983, on the ground that the statements were obtained in violation of his Fifth and Sixth Amendment rights. The motions were heard in open court and denied in a decision filed July 29, 1983. The motion to suppress was denied on the ground that some of the statements were the ones alleged in the indictment to be false and, as to the others, no facts had been alleged to show that the statements had been given involuntarily, in a custodial setting, or after adversarial proceedings had begun. Subsequently, Chief Judge Munson granted

Klepfer's motion to reconsider the denial of the motion to suppress, vacated that portion of the July 29 ruling that had denied the motion, and granted leave to file a supplemental suppression motion.

On September 23, 1983, Klepfer filed under seal his renewed motion to suppress and subsequently filed, also under seal, a memorandum in support of the suppression motion, a motion to exclude the public from the hearing on the suppression motion, and a brief in support of the closure motion. These matters were considered by the District Court on October 13, 1983, initially in open court. The Government stated its opposition to closing the courtroom:

> The government does not feel that there is any greater threat posed by the continuance of an open hearing in a case that's already been made public where there's been a public indictment, there ha[ve] been newspaper articles and conclusions drawn from the articles and the public proceedings so far....

The District Judge inquired if anyone in the courtroom wished to be heard on the issue of closure. A reporter for the *Post Standard* stated his objection and said that the publisher had told him on the telephone that a lawyer for the newspaper was on his way to the courthouse. After a brief recess, the Court entertained argument from counsel for the newspaper. Not having access to the sealed materials relied on by the defendant for the closure motion, counsel argued generally that closure of criminal proceedings was improper in the absence of specific findings justifying such action and consideration of alternative solutions.

Chief Judge Munson acknowledged that counsel for the newspaper did not know the basis for the closure request, but explained that "if I tell you what the basis is, I might as well not close it." The District Judge granted the defendant's request for closure with this explanation:

> I believe in this case the interest of justice, as well as due process rights of the defendant, will be best served by the closure of these proceedings. I think all

of us know that in the Gannett Company case [*Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)] the United States Supreme Court recognized that trial judges have an affirmative obligation to minimize the effects of what might be extremely prejudicial pretrial publicity. In this case the potential for harm to this defendant, as well as the tainting of any future proceedings by pretrial disclosures, I think outweighs the right of the public at this time and the press to attend this hearing.

The hearing on the motion to suppress was then conducted in a closed courtroom for four days. On November 9, 1983, the District Judge entered an order confirming that the transcript of the hearing and all papers submitted by the prosecution and defense in connection with the hearing remain under seal, denying The Herald Company's request for access to the transcript and such papers, and denying The Herald Company's request for prior notice of any further actions to exclude the public from proceedings in the case. The Herald Company appeals from both the October 13 and November 9 orders.

## Discussion

■ Though not challenged by the parties, we consider initially our appellate jurisdiction. The District Court in effect permitted The Herald Company to intervene in the pending criminal case, at least for the limited purpose of objecting to closure of the courtroom. We agree with the Third Circuit that an order of closure is a final decision as to an intervenor within the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed.2d 1528 (1949). *United States v. Cianfrani*, 573 F.2d 835, 845 (3d Cir.1978); *cf. Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 425–26 (5th Cir.1981) (order denying access to videotape evidence appealable); *In re Application of National Broadcasting Co. (United States v. Myers)*, 635 F.2d 945, 949 n. 2 (2d Cir.1980) (order granting access to videotape evidence appealable); *United States v. Gurney*, 558 F.2d 1202, 1206–07 (5th Cir.1977) (order denying access to documentary evidence appealable), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); *see generally United States v. Chagra*, 701 F.2d 354, 358–60 (5th Cir.1983) (collecting cases on appealability issue); *but see United States v. Brooklier*, 685 F.2d 1162, 1165–66 (9th Cir.1982) (closure order not appealable by non-party, but order reviewed on petition for mandamus).

Turning to the merits, we note at the outset that we face no issue here concerning the authority of a trial court to prevent representatives of the press from publishing information in their possession. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). This is not a case of prior restraint; the issue concerns access to information. More precisely, the issue is whether and to what extent the First Amendment limits a trial judge's authority to exclude the public from a pretrial suppression hearing. In resolving that issue, our task is to extract, as best we can, a governing principle from the four recent decisions of the Supreme Court on the subject of courtroom closure: *Press-Enterprise Co. v. Superior Court*, —— U.S. ——, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); and *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). Though no one of these cases resolves our precise issue, various opinions in all of them provide a substantial basis for decision.

The Court's initial encounter with a closure order provided scant encouragement for a First Amendment claim. Justice Stewart's opinion for the five-member majority in *Gannett* was willing to assume that the First Amendment might guarantee access to a suppression hearing in some circumstances, but concluded that whatever protection might be afforded was not impaired by the order being reviewed. 443 U.S. at 392–93, 99 S.Ct. at 2911–12. However, one member of that majority, Justice

Rehnquist, pointedly disassociated himself from any support for First Amendment protection in this context. He thought it "clear that this Court repeatedly has held that there is no First Amendment right of access in the public or the press to judicial or other governmental proceedings." *Id.* at 404, 99 S.Ct. at 2918 (citations omitted). Moreover, Justice Blackmun, writing for himself and Justices Brennan, White, and Marshall, in partial dissent, expressed the view that the Court "heretofore has not found, and does not today find, any First Amendment right of access to judicial or other governmental proceedings." *Id.* at 411, 99 S.Ct. at 2921 (citations omitted). Thus, in *Gannett* a majority of the Court understood the law at that time to preclude any First Amendment objection to a closure order.[1] Only Justice Powell expressed the view that the excluded reporter "had an interest protected by the First and Fourteenth Amendments in being present at the pretrial suppression hearing," *id.* at 397, 99 S.Ct. at 2914 (footnote omitted), and he found no unconstitutional encroachment upon that interest under the circumstances of the case.

The very next year, in *Richmond Newspapers,* seven members of the Court agreed that the First Amendment assures some right of access to some governmental proceedings and held that closure of a courtroom during a criminal *trial,* under the circumstances presented, abridged that First Amendment right. 448 U.S. at 577, 100 S.Ct. at 2827 (Burger, C.J., with whom White and Stevens, JJ., join); *id.* at 598, 100 S.Ct. at 2839 (Brennan, J., with whom Marshall, J., joins, concurring in the judgment); *id.* at 599, 100 S.Ct. at 2839 (Stewart, J., concurring in the judgment); *id.* at 604, 100 S.Ct. at 2842 (Blackmun, J., concurring in the judgment). Only Justice Rehnquist found no First Amendment right of access to a trial, at least no right that would preclude a closure ordered by a state court. *Id.* at 606, 100 S.Ct. at 2843, Justice

Powell did not participate. *Id.* at 581, 100 S.Ct. at 2829.

The seven Justices supporting some First Amendment right of access differed, however, in the rationale, and the difference bears significantly upon our task of determining whether the right of access to a trial applies to a pretrial suppression hearing. Though all of the Justices in the *Richmond Newspapers* majority relied on the historical argument that trials had traditionally been open to the public, four of them also relied upon a functional argument—a First Amendment right of access to governmental activities arises whenever public observation serves important public purposes. *Id.* at 584, 100 S.Ct. at 2831 (Stevens, J., concurring: "the First Amendment protects the public and the press from abridgements of their rights of access to information about the operation of their government, including the Judicial Branch"); *id.* at 589, 100 S.Ct. at 2834 (Brennan, J., with whom Marshall, J., joins, concurring in the judgment: "what is crucial in individual cases is whether access to a particular government process is important in terms of that very process"); *id.* at 604, 100 S.Ct. at 2832 (Blackmun, J., concurring in the judgment: "the public has an intense need and a deserved right to know about the administration of justice in general"). Since Justice Powell's opinion in *Gannett* had previously relied on the functional argument, 443 U.S. at 397, 99 S.Ct. at 2914 ("the importance of the public's having accurate information concerning the operation of its criminal justice system"), it now appeared that a five-member majority favored some form of a right of access to those government functions of significant interest to the public.

In *Globe Newspapers* a five-member majority appeared to lend further support to the functional argument for a First Amendment right of access. 457 U.S. at 604–05, 606, 102 S.Ct. at 2618–2620 (Brennan, J.,

1. Justice Stewart was subsequently to express the view that only Justices Powell and Rehnquist had considered the First Amendment issue in *Gannett* and that the other members of the Court "were silent on the question." *Richmond Newspapers, Inc. v. Virginia, supra,* 448 U.S. at 599, 100 S.Ct. at 2839.

with whom White, Marshall, Blackmun, and Powell, JJ., join: "to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966)); "the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole"). Justice Brennan's opinion also emphasized the historical argument. 457 U.S. at 605, 102 S.Ct. at 2619. Justice O'Connor, who had replaced Justice Stewart, supported a right of access and noted the reliance in *Richmond Newspapers* on both "our long history of open criminal trials and the special value, for both public and accused, of that openness." *Id.* at 611, 102 S.Ct. at 2623. There now appeared to be seven Justices placing at least some reliance on the functional argument (Justices Brennan, White, Marshall, Blackmun, Powell, Stevens,[2] and O'Connor).[3] Indeed, Chief Justice Burger's dissenting opinion in *Globe Newspaper* faulted Justice Brennan's majority opinion because it "ignores the weight of historical practice ... a long history of exclusion of the public from trials involving sexual assaults, particularly those against minors." *Id.* at 614, 102 S.Ct. at 2614.

The recent opinion in *Press-Enterprise* sheds little additional light on whether the right of courtroom access is grounded on history or public benefit or both. The Court, having previously upheld a right of access to a criminal *trial*, simply ruled, unanimously, that for purposes of this right of access, jury selection is part of the trial. Of interest is Justice Stevens' concurring opinion, arguing that since the right of access had been grounded in the prior decisions upon the value of informing the public about the operation of an impor-

tant governmental activity, it made no difference whether jury selection is considered part of the trial. 104 S.Ct. at 828.

■ In summary, the holdings of the four closure cases tell us that closure was properly ordered in a pretrial suppression hearing and improperly ordered in three instances of trial proceedings. However, the increasing reliance by a majority of the Justices upon the functional argument strongly suggests that we should recognize some degree of First Amendment access to pretrial proceedings. If the First Amendment protects the public from abridgement of a right of access to information about government "including the Judicial Branch," *Richmond Newspapers, supra*, 448 U.S. at 584, 100 S.Ct. at 2831 (Stevens, J., concurring), the conduct of pretrial proceedings surely constitutes an important segment of that information. It makes little sense to recognize a right of public access to criminal courts and then limit that right to the trial phase of a criminal proceeding, something that occurs in only a small fraction of criminal cases. There is a significant benefit to be gained from public observation of many aspects of a criminal proceeding, including pretrial suppression hearings that may have a decisive effect upon the outcome of a prosecution.

■ Even if a right of access exists only as to proceedings historically public, it does not follow that closure of a pretrial suppression hearing encounters no First Amendment objection. Though the concurring opinion of the Chief Justice in *Gannett* argued that pretrial proceedings were not public at common law, 443 U.S. at 394–97, 99 S.Ct. at 2912–14, the dissenting opinion of Justice Blackmun for four members of the Court pointed out that "the modern suppression hearing, unknown at common law, is a type of objection to evidence such as took place at common law

---

**2.** Justice Stevens, who had relied on the functional argument in *Richmond Newspapers*, expressed no opinion on the merits in *Globe Newspaper*, believing that the appeal should have been dismissed. 457 U.S. at 620–23, 102 S.Ct. at 2627.

**3.** It is unfortunate that we must rely on nose-count jurisprudence but, in the absence of an authoritative majority opinion from the Supreme Court, we must seek our guidance from the available expressions of the various views of its members.

... in *open court* during trial." *Id.* at 437, 99 S.Ct. at 2934 (emphasis in original). There is no sound reason for having the *existence* of a right of access to a hearing on the admissibility of evidence turn on whether the hearing is held during or before the trial, though the degree of protection afforded by that right may be substantially diminished in the pretrial context.

■ We therefore agree with the Third and Ninth Circuits that the First Amendment extends some degree of public access to a pretrial suppression hearing. *United States v. Criden*, 675 F.2d 550, 557 (3d Cir.1982); *United States v. Brooklier, supra,* 685 F.2d at 1169–71; *cf. United States v. Chagra, supra,* 701 F.2d at 362–64 (5th Cir.1983) (bail hearing).

Recognizing the right, however, does not determine the degree of protection it provides. Justice Blackmun did not overstate the case by observing in *Richmond Newspapers* that "uncertainty marks the nature—and strictness—of the standard of closure the Court adopts" in the trial context. 448 U.S. at 603, 102 S.Ct. at 2625. Justice Stewart's majority opinion in *Gannett,* which had assumed the existence of the First Amendment right of access, upheld pretrial closure upon the trial judge's conclusion that "an open proceeding would pose a 'reasonable probability of prejudice to these defendants.'" 443 U.S. at 393, 99 S.Ct. at 2912. In the trial context, Justice Stewart, employing the law's most ubiquitous standard, has framed the test in terms of "reasonable" limitations. *Richmond Newspapers, supra,* 448 U.S. at 600, 102 S.Ct. at 2617. Justice Powell, articulating in *Gannett* a test applicable to pretrial proceedings, would require the defendant to "make some showing that the fairness of the trial likely will be prejudiced by public access to the proceedings." 443 U.S. at 401, 99 S.Ct. at 2916. Chief Justice Burger's plurality opinion in *Richmond Newspapers* permits trial closure only for

"an overriding interest articulated in findings," 448 U.S. at 581, 100 S.Ct. at 2829, a standard that seems conclusory unless it is intended to invoke the stringent "compelling interest" test required to be met before conduct may be regulated by means that indirectly impair First Amendment freedom of expression, *see, e.g., United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968); *NAACP v. Button,* 371 U.S. 415, 438–40, 83 S.Ct. 328, 340–41, 9 L.Ed.2d 405 (1963). Justice Brennan has spoken of a presumption of openness that may be overcome only by "sufficiently compelling" interests. 448 U.S. at 598, 100 S.Ct. at 2839. Justice Blackmun would require a defendant to establish that pretrial closure is "strictly and inescapably necessary in order to protect the fair-trial guarantee." [4] *Gannett, supra,* 443 U.S. at 440, 99 S.Ct. at 2936. Justice Marshall would require a showing that a closure order "constitutes *the least restrictive means available* for protecting compelling state interests." *Press-Enterprise, supra,* 104 S.Ct. at 830 (emphasis in original). The Third Circuit permits closure of a suppression hearing only upon findings "that other means will be insufficient to preserve the defendant's rights and that closure is necessary to protect effectively against the perceived harm." *United States v. Criden, supra,* 675 F.2d at 561–62. The Ninth Circuit has adopted Justice Blackmun's slightly more rigorous standard that closure of a suppression hearing must be " 'strictly and inescapably necessary in order to protect the fair-trial guarantee.' " *United States v. Brooklier, supra,* 685 F.2d 1162, 1167 (quoting *Gannett, supra,* 443 U.S. at 440, 99 S.Ct. at 2936 (Blackmun, J., concurring in part and dissenting in part)). The Fifth Circuit, articulating a test for closure of a pretrial bail hearing, requires a showing of "likely" prejudice to a fair trial that cannot "adequately" be removed by alternatives and for which closure will "probably be effec-

---

**4.** Justice Blackmun articulated this standard as a construction of the Sixth Amendment, but gave no indication that he favored a different standard when the Court grounded the right of access on the First Amendment. *Richmond Newspapers, supra,* 448 U.S. at 601–04, 100 S.Ct. at 2840–42 (Blackmun, J., concurring in the judgment).

tive." *United States v. Chagra, supra,* 701 F.2d at 365.

■ Until authoritatively instructed by the Supreme Court, we are reluctant to frame a test for closure of a pretrial suppression hearing that incorporates the rigorous First Amendment standards associated with abridgement of free expression. We recognize, as we believe we have been advised to do, that the First Amendment assures some degree of access to suppression hearings. But we also recognize a difference between a right of access and a right of expression. Without doubting the relevance of the former to the latter, we find nothing in the terms or tradition of the First Amendment that would accord as stringent protection to access as to speech. The freedom to speak is at the core of the First Amendment. Impairment of that right threatens the most fundamental of constitutional values. Abridgement of free speech not only silences one speaker, it also inhibits others from exercising their rights of expression. Denial of access, however, though preventing discussion of the withheld information, exerts no chilling effect upon free discussion generally. If anything, denial of access spurs efforts to elicit information, sometimes heightening awareness of and interest in the very topic on which details have been withheld.

To claim a value in access to information, even information concerning significant governmental activities, comparable to the value of freedom of expression, is to ignore 200 years of First Amendment jurisprudence. As recently as the *Gannett* decision in 1979, a majority of the Supreme Court, citing *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609, 98 S.Ct. 1306, 1317, 55 L.Ed.2d 570 (1978), and *Pell v. Procunier,* 417 U.S. 817, 833–35, 94 S.Ct. 2800, 2809–10, 41 L.Ed.2d 495 (1974), asserted the complete absence of a First Amendment right of access to governmental proceedings. 443 U.S. at 404, 99 S.Ct. at 2918 (Rehnquist, J., concurring); *id.* at 411, 99 S.Ct. at 2921 (Blackmun, J., with whom Brennan, White, and Marshall, JJ., join, concurring in part and dissenting in part). The recognition of some form of First Amendment access right in *Richmond Newspapers* was recognized as a "watershed" decision. 448 U.S. at 582, 100 S.Ct. at 2830 (Stevens, J., concurring). We see no indication in that decision or the subsequent cases that a majority of the Supreme Court is prepared to accord to this newly minted right the same degree of protection historically accorded to free expression.

■ Of course, closure of a suppression hearing should not be lightly undertaken. It should be invoked only upon a showing of a significant risk of prejudice to the defendant's right to a fair trial or of danger to persons, property, or the integrity of significant activities entitled to confidentiality, such as ongoing undercover investigations or detection devices, *e.g., United States v. Bell,* 464 F.2d 667 (2d Cir.) (public excluded from portion of suppression hearing detailing "hijacker profile"), *cert. denied,* 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972). Though we do not believe that closure must be found to be the least restrictive means possible to avoid the perceived risk, the trial judge must consider alternatives and reach a reasoned conclusion that closure is a preferable course to follow to safeguard the interests at issue. The closure should be tailored to the circumstances of the perceived risk. For example, if the risk arises from the content of a document, such as a defendant's statement, only that document should be withheld from public scrutiny, as long as the hearing can be conducted without divulging its content. The trial judge must articulate the basis for any closure order, supplying sufficient basis for appellate review. If such articulation would itself reveal information entitled to remain confidential, the basis for closure may be set forth in a sealed portion of the record.

■ Applying this standard to the closure order challenged on this appeal, we cannot sustain the order on the limited basis thus far set forth by the District Judge, although grounds for closure may be available. In the public portion of the

suppression hearing, Chief Judge Munson, identified, in conclusory fashion, two grounds for closure: "the potential for harm to this defendant" and "tainting of any future proceedings by pre-trial disclosures." The Judge did not elaborate on these grounds in the sealed portion of the transcript nor file under seal any supplement to his closure order of November 9. Our review of the sealed transcript and exhibits reveals the concerns the Judge most likely had in mind, but also raises uncertainty as to whether complete closure was warranted.

Though the basis for apprehending harm to the defendant is apparent, the record raises a question as to whether the information sought to be kept confidential has already been given sufficient public exposure to preclude a closure order on this account. Sealed court exhibit 1, for example, contains as an attachment an article from a nationally circulated newspaper; the article reveals the substance of what the District Judge appears to have believed warranted confidentiality. It may be that the substance of the article has not been reported in the Syracuse area, and arguably confidentiality of public information might be warranted upon a showing of risk arising from local dissemination. However, we note that in opposing closure, the prosecutor pointed out the existence of "newspaper articles." That reference, plus the disclosure contained in the attachment to court exhibit 1, obliged the District Court to call upon the prosecutor to pursue the matter to ascertain whether the confidential information had been published locally.[5] If it had, closure of the hearing or some limited parts of it might still be warranted if the hearing might reveal details, knowledge of which would create significant risk of harm to the defendant beyond what might arise from dissemination of the basic information. If it had not, the Dis-

trict Judge would still have to determine whether the risk of local dissemination of even the basic information posed a significant risk to the defendant beyond the risk arising from the publication that had already occurred.

The basis for apprehending "tainting of any future proceedings" may have been the content of the statements sought to be suppressed, at least those statements not already disclosed in the indictment. If that was the trial judge's concern, we see no reason why the hearing could not have been conducted in public with these statements placed under seal. There is a legitimate public interest in knowing the grounds on which government conduct in obtaining evidence is challenged, even if the content of that evidence must temporarily remain confidential. *See United States v. Clark*, 475 F.2d 240, 246–47 (2d Cir.1973). If the risk of taint to the trial proceedings arose from something other than the content of these statements, that basis should be identified (in sealed findings, if appropriate).

In addition to its substantive challenge to the closure orders, The Herald Company also contends that the orders are procedurally infirm, especially to the extent that the November 9 order denies its request for prior notice of any further motions to exclude the public from proceedings in this case. The case law on the procedural aspects of a right of access is, as yet, no clearer than what has emerged on the substantive aspects. A footnote to the majority opinion in *Globe Newspaper Co.* states that "representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion,'" 457 U.S. at 609 n. 25, 102 S.Ct. at 2622 n. 25 (citing *Gannett, supra*, 443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring)). The means of affording that opportunity remain uncertain. Justice Powell's

**5.** The burden of producing such evidence is properly placed upon the Government in this case, since it opposed the closure motion on the ground that information previously confidential was already publicly disseminated. If a closure motion is supported by all the initial parties to a

case, a trial judge may have to undertake some brief examination of local press coverage, at least in the unusual case like this where the information sought to be protected has been broadly disseminated.

concurring opinion in *Gannett* expressed the view that "this opportunity extends no farther than the persons actually present at the time the motion for closure is made." 443 U.S. at 401, 99 S.Ct. at 2916. Four Justices in *Gannett* also stated that there must be an opportunity for protest by "any person removed from a court," *id.* at 445, 99 S.Ct. at 2939 (Blackmun, J., with whom Brennan, White, and Marshall, JJ., join, concurring in part and dissenting in part), but did not indicate whether that limited opportunity suffices in situations where no one is present at the time a courtroom is closed.[6] The Third Circuit has ruled, in the exercise of its supervisory powers, that a closure motion must be docketed sufficiently in advance of a hearing on such motion to permit intervention by interested members of the public. *United States v. Criden, supra,* 675 F.2d at 559. The Ninth Circuit has added a further procedural requirement: "where a closure motion is not filed of record or made in open court, and when, as here, the court has been made aware of the desire of specific members of the public to be present, reasonable steps should be taken to afford such persons an opportunity to submit their views to the court before exclusion is accomplished." *United States v. Brooklier, supra,* 685 F.2d at 1168.

■■■■■ Since by its nature the right of public access is shared broadly by those not parties to the litigation, vindication of that right requires some meaningful opportunity for protest by persons other than the initial litigants, some or all of whom may prefer closure. Moreover, it seems entirely inadequate to leave the vindication of a First Amendment right to the fortuitous presence in the courtroom of a public spirit-ed citizen willing to complain about closure. Some form of public notice should be given, since it is important, perhaps especially so, to afford an opportunity to challenge courtroom closure accomplished in the absence of spectators. The fact that no member of the public was sufficiently interested to attend a particular court session does not mean that there is lacking a significant public interest in later seeking access to the transcript of a closed hearing or testing on appeal the validity of a closure order. At the same time, we recognize that notice requirements must remain sufficiently flexible to accommodate the exigencies of the litigation process and avoid unwarranted delays. *See Gannett, supra,* 443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring); *id.* at 446, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part); *United States v. Brooklier, supra,* 685 F.2d at 1168.

■■■■■ We agree with the Third Circuit that a motion for courtroom closure should be docketed in the public docket files maintained in the court clerk's office. *See* Fed. R.Crim.P. 55; Fed.R.Civ.P. 79(a). The motion itself may be filed under seal, when appropriate, by leave of court, but the publicly maintained docket entries should reflect the fact that the motion was filed, the fact that the motion and any supporting or opposing papers were filed under seal, the time and place of any hearing on the motion, the occurrence of such hearing, the disposition of the motion, and the fact of courtroom closure, whether ordered upon motion of a party or by the Court *sua sponte.* Entries on the docket should be made promptly, normally on the day the pertinent event occurs.[7] The occasions for

---

**6.** Justice Blackmun stated that "the public need not be given prior notice that a closure order will be considered at a given time and place," *Gannett, supra,* 443 U.S. at 446, 99 S.Ct. at 2939, but this assertion leaves it uncertain whether some means must be used to give notice of the fact that closure has occurred.

**7.** There may be extraordinary situations where even the contemporaneous notation in the docket that courtroom closure has been sought or has occurred could create a substantial risk of harm to an individual. For example, a closure order docketed the week before the start of a multi-defendant trial might indicate that one defendant had been granted immunity *in camera* in anticipation of his testifying against the other defendants, an inference that could endanger the witness-defendant if the basis for the inference was disclosed prior to his testifying. We do not foreclose a trial judge, in unusual circumstances, from ordering that docketing of closure proceedings be delayed for some brief

courtroom closure should be sufficiently rare to make this prompt and detailed docketing requirement an insignificant burden for district court clerk's offices. We think this type of general public notice suffices to afford an adequate opportunity for challenge to courtroom closure. We do not intend to foreclose any district from electing to supplement the docketing requirement we have outlined with steps of its own, such as notification to one of the news media or perhaps to one attorney in those areas where substantial agreement can be achieved as to the appropriate recipient of such notice.

### Conclusion

We recognize that the conduct of criminal proceedings at the trial and pretrial stage imposes substantial burdens on district judges, and we are not anxious to multiply their tasks. However, since courtroom closure encounters some degree of First Amendment protection of a right of access, a trial judge must articulate on the public or sealed record a sufficiently detailed basis for his serious concern about public dissemination risks and for his marked preference for closure over alternative remedies to permit an appellate court to judge whether First Amendment limits have been observed. Unable to make that determination at this point, we remand the matter to the District Court for further proceedings consistent with this opinion. Jurisdiction will be retained by this panel in the event of a subsequent appeal from the challenged closure orders.

Remanded.

MacMAHON, District Judge, dissenting:

Respectfully, I dissent. I believe that the majority strays too far from the reasoning of the Supreme Court in *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (Stewart, J., majority opinion)—the only Supreme Court decision squarely addressing the issue of public and press access to pretrial suppression hearings.

### I.

Writing for the majority in *Gannett Co.,* Justice Stewart flatly rejected any Sixth Amendment right of access and declined to decide whether access was mandated by the First Amendment. *Id.* at 392, 99 S.Ct. at 2911, Chief Justice Burger concurred and wrote to emphasize the long-standing historical distinction between trials and pretrial proceedings and, perhaps more significantly, the practical distinction between trials and suppression hearings. *Id.* at 394–96, 99 S.Ct. at 2912–13. As the Chief Justice stated: "To make public the evidence developed in a motion to suppress evidence [citation omitted] would, so long as the exclusionary rule is not modified, introduce a new dimension to the problem of conducting fair trials." *Id.* at 396, 99 S.Ct. at 2913.

Justice Rehnquist, in his concurrence, flatly rejected the First Amendment access argument, noting the consistent line of Supreme Court cases rejecting the notion that the public, in its own right or through a surrogate press, has a First Amendment right of access to government proceedings. *Id.* at 404, 99 S.Ct. at 2918.

Even Justice Blackmun, writing for the dissenters, did not find any First Amendment right of access to suppression hearings. *Id.* at 411, 99 S.Ct. at 2921 (joined by Justices Brennan, White and Marshall). Only Justice Powell viewed the First Amendment as guaranteeing such a right, and that right was strictly qualified, was carefully tailored to the realities of criminal trials, and gave due deference to the proximity and informed judgment of the trial judge. *Id.* at 397, 399–403, 99 S.Ct. at 2914, 2915–2917.

Recognizing that the only apposite Supreme Court decision, *Gannett Co., supra,* "provided scant encouragement for a First Amendment claim," *ante,* at 96, the ma-

---

interval, provided that the interval ends upon a specified date or the occurrence, within a reasonable time, of a specified event and that the

judge's reasons for delaying docketing of the closure proceedings are set forth, under seal if appropriate, for eventual appellate scrutiny.

jority embarks on a painstaking search for the philosopher's stone in subsequent Supreme Court decisions dealing with closure issues. And although the stone is not to be found, the majority does stitch together a quilt of isolated phrases from which it derives a "functional argument" in support of constitutionally guaranteed access to suppression hearings. *Ante,* at 97, 98.

I believe, however, that this patchwork is of little predictive value because it ignores the determinative fact that the three closure cases which followed *Gannett Co.* address only the closure of trial proceedings. Those cases do not involve the closure of preliminary suppression hearings which, unlike trials, have no common law history of public access and which, because of the substance and timing of the hearing, may well implicate the defendant's right to a fair trial, and, in some instances, pose a threat to his safety and even to his life.

A further difficulty with implying a right of access to suppression hearings on the basis of a "functional argument" analysis is that "'the stretch of this protection is theoretically endless,' .... For so far as the participating citizen's need for information is concerned, 'there are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.' *Zemel v. Rusk,* [381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280, 1281, 14 L.Ed.2d 179 (1965) (Warren, C.J.)]." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 588, 100 S.Ct. 2814, 2833, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring).

Obviously, as suggested by Justice Brennan, *supra,* there must be a practical limit to the nooks and crannies of criminal proceedings and the criminal justice system into which a "functional argument" rationale inevitably leads. And those sitting on the Supreme Court, except for Justice Powell, have either rejected the extension of this rationale to suppression hearings or been careful to avoid the suggestion that the "functional argument" necessarily requires access to suppression hearings. For example, while the majority places Justice O'Connor in the "functional argument" camp, *ante,* at 98, she explicitly stated that her concurrence in *Globe Newspaper* was based on the fact that the closure order in question involved a criminal trial. She further stated that, in her opinion, the Court's decision, as well as its prior decision in *Richmond Newspapers, Inc.,* did not "carry any implication outside the context of criminal *trials." Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 611, 102 S.Ct. 2613, 2623, 73 L.Ed.2d 248 (1982) (emphasis added).

Even after accepting a "functional argument" rationale for access to some aspects of judicial proceedings, it is clear that a line must be drawn. However, the majority believes "[i]t makes little sense to recognize a right of public access to criminal courts and then limit that right to the trial phase of a criminal proceeding...." *Ante,* at 98.

Yet, access to sealed court documents, to plea bargaining sessions, to prisons, to information within the government's control, and to the decision-making processes within government offices and agencies, *e.g.,* the district attorney's office, probation departments, and parole boards, would substantially enhance public discussion and knowledge of the criminal justice system. Nevertheless, traditionally none of these areas has been open to the public, nor are they likely to be made so in the future. *See, e.g., Branzburg v. Hayes,* 408 U.S. 665, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations.") *See also Gannett Co., supra,* 443 U.S. at 404–05, 99 S.Ct. at 2918–19 (and cases cited therein); *Houchins v. KQED, Inc.,* 438 U.S. 1, 11–12, 15, 98 S.Ct. 2588, 2594–2596, 2597, 57 L.Ed.2d 553 (1978) (prisons; First Amendment does not "mandat[e] a right of access to government information or sources of information within the government's control").

Suppression hearings stem from a judicially created rule and are a relatively recent development; they have never been considered part of the trial of a criminal case. *See generally Gannett Co., supra,* 443 U.S. at 387–91, 394–97, 99 S.Ct. at 2912–14. Reference to historical practice is especially valuable in delimiting, as we are today, the scope of a newly recognized constitutional guarantee. Therefore, the long-standing historical dichotomy between trial and pretrial proceedings bears forcefully on the issue of access.

However, the reason for holding suppression hearings outside the vortex created by the majority's "functional argument" rationale for access is not limited to a purely historical argument. A preliminary suppression hearing, compared to a criminal trial, presents a sparse and much less compelling text from which the public might glean a greater understanding of the administration of criminal justice in our society. In the trial of a criminal case, the government exercises one of the most awesome powers delegated to government in a free society: the power of the state to prosecute and punish an individual for his or her conduct. Clearly, in this context, there is a compelling argument that the process by which the government brings this formidable power to bear on an individual should be open to public scrutiny.

In a suppression hearing, however, the issue is not the guilt and punishment of an individual. Rather, the narrow inquiry is strictly limited to the technical, and usually pro forma, question of the propriety of police conduct. More often than not, the motion to suppress is either patently meritless or crumbles under the slightest scrutiny. In the less frequent case where a motion to suppress is granted, the result is not deprivation of life, liberty, or property, but rather the simple exclusion of the illegally obtained evidence.

Constitutionally required access to pretrial suppression hearings also raises acute practical and constitutional concerns. In *Richmond Newspapers, Inc., supra,* 448 U.S. at 588, 100 S.Ct. at 2833, Justice Brennan aptly observed: "The judicial task is as much a matter of sensitivity to practical necessity as it is of abstract reasoning." This is particularly true when charting the appropriate contours of a right which has only recently been recognized and which derives from a "functional" analysis of the First Amendment protections and "penumbral" guarantees.

Addressing both practical and constitutional concerns, it is clear that publicity in the context of a pretrial suppression hearing poses a double-edged threat: the intended effect of the exclusionary rule may, as a practical matter, be circumvented, and insuring a fair trial will, at best, become considerably more difficult and unduly time consuming. Similar concerns did not go unnoticed by Justice Stewart:

"Publicity concerning pretrial suppression hearings ... poses special risks of unfairness. The whole purpose of such hearings is to screen out unrealiable or illegally obtained evidence and insure that this evidence does not become known to the jury. *Cf. Jackson v. Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908, (1964)]. Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.

The danger of publicity concerning pretrial suppression hearings is particularly acute, because it may be difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial. After the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means. When such information is publicized during a pretrial proceeding, however, it may never be altogether kept from potential jurors." *Gannett Co., supra,* 443 U.S. at 378–79, 99 S.Ct. at 2904–05 (footnote omitted).

Chief Justice Burger has expressed a similar concern; specifically, the special nature of a suppression hearing raises signifi-

cant fair trial complications which are simply not present in the context of access to criminal proceedings:

"When the Sixth Amendment was written, and for more than a century after that, no one could have conceived that the exclusionary rule and pretrial motions to suppress evidence would be part of our criminal jurisprudence. The authors of the Constitution, imaginative, farsighted, and perceptive as they were, could not conceivably have anticipated the paradox inherent in a judge-made rule of evidence that excludes undoubted truth from the truth-finding processes of the adversary system. Nevertheless, as of now, we are confronted not with a legal theory but with the reality of the unique strictures of the exclusionary rule, and they must be taken into account in this setting. To make public the evidence developed in a motion to suppress evidence, *cf. Brewer v. Williams,* 430 U.S. 387 [97 S.Ct. 1232, 51 L.Ed.2d 424] (1977), would, so long as the exclusionary rule is not modified, introduce a new dimension to the problem of conducting fair trials." *Id.* at 395–96, 99 S.Ct. at 2913–14.

Pretrial publicity which focuses on suppression hearings will, at a minimum, further complicate and prolong the *voir dire.* The trial will then be further sidetracked, frequently on the eve or even the first day of the trial, while the court not only assesses the nature and extent of suppression hearing publicity but also undertakes the tortuous analysis to which today's majority subjects the district court's ruling. Moreover, if the jury has not been empanelled prior to suppression hearing publicity, a long continuance or change of venue might be required. Of course, this decision itself will entail additional delay. Even if the jury has been empanelled prior to the hearing, a decision must be made whether the potential publicity might be such as to require sequestration prior to the hearing. And, where the jury has been empanelled but not sequestered prior to the hearing, publicity from the hearing will raise the issue of prejudice. The court must then

pause to consider, at a minimum, whether additional *voir dire* of the jurors is necessary.

The majority seems to suggest that these problems might be avoided simply by tailoring the closure order to avoid the perceived risks. *Ante,* at 101. However, this requirement places a great burden on the trial court where, as in this case, none of the parties, including the media representatives, suggested an alternative other than closed or open proceedings. In any event, affording the trial court the opportunity to tailor its order does not eliminate the potential for delay. The court must still undertake an elaborate "realistic risk" evaluation; next, alternatives must be developed and considered; finally, an opinion must be rendered articulating with great care the basis for whatever degree of closure is ordered. Following this time-consuming procedure, the ruling is still subject to appellate review and the attendant delay and, ironically, is now open to attack on many more grounds than those available before today's decision. Thus, the effect of the rule which the majority adopts is to undercut the fair and speedy trial of criminal cases explicitly guaranteed by the Constitution while increasing costs to the parties, the court, and, ultimately, to the public purse.

Based on a comparison between the values implicated in a criminal trial and those in a suppression hearing, as well as the acute practical and constitutional difficulties arising from open suppression hearings, I believe that a distinction between trials and pretrial suppression hearings is fully warranted for First Amendment purposes.

In summary, the Supreme Court refused to find a First Amendment right of access to suppression hearings in *Gannett Co., supra,* the Court's only case addressing the issue. Furthermore, in *Richmond Newspapers, Inc., supra,* and subsequent trial closure cases, a majority of the Court punctiliously confined the "functional argument" rationale to trials. Finally, the his-

 

tory of pretrial hearings, the limited function and scope of suppression hearings, and the probability that access to such hearings will exacerbate constitutional and practical problems at trial provide a sound basis for continuing to exclude suppression hearings from a First Amendment right of access.

## II.

Finally, the district court's closure order should be affirmed even if we apply the majority's standard and requirement of articulated findings. The district court, consistent with the majority's opinion, recognized a right of public access to pretrial suppression hearings under the First Amendment. The court was intimately familiar with the case, its context, and its broader implications. The court fully considered the motion papers, briefs, and other relevant documents. The court heard oral argument from all parties, including the press, and even reconsidered its order following the submission of briefs by the press. The court then applied the appropriate balancing test: "In this case the potential for harm to this defendant, as well as the tainting of any future proceedings by pretrial disclosures I think outweighs the right of the public at this time and the press to attend this hearing."

The district court's reasons for closure are specific. Moreover, uncontradicted facts in the sealed record before us manifestly support a conclusion that an open hearing presented a "realistic risk" of prejudice or harm to the defendant.[1] Thus, the district court's ruling in open court and the sealed record clearly "supply a sufficient

basis for appellate review." *Ante,* at 100. The district court might have facilitated review by expressly marshalling the evidence constituting the factual basis for its conclusion. But "articulated" findings surely do not require the district court to labor the obvious or to write reams supporting its conclusion. The sealed motion papers unmistakably set forth a specific, uncontradicted, and highly compelling factual basis for closure. To require more is to exalt form over substance.

The majority addresses the district court's concern over the potential for prejudicial pretrial publicity but queries "whether the information sought to be kept confidential has already been given sufficient public exposure to preclude a closure order on this account." *Ante,* at 101. On this point, however, the majority gives no weight to the district court's first-hand knowledge and evaluation of the extent and impact of local publicity. Nor does the majority adequately consider the fact that continued publicity, even though involving previously published information, will likely result in wider circulation of the information and may well rekindle public emotion in the community.[2] As a result, defendant's fair trial concerns become more compelling, and the court's ability to assure a fair trial becomes more suspect.

I would affirm.

---

**1.** As noted, *supra,* Part I at 106, none of the parties opposing closure presented any alternative to closure other than holding an open hearing. I believe that, after a "realistic risk" showing by the proponent of closure, "members of the press and public who object to closure have the responsibility of showing to the court's satisfaction that alternative procedures are available that would eliminate the dangers shown by the defendant...." *Gannett Co., supra,* 443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring). Moreover, in this case, as in *Gannett Co.,* the district court was faced with the "unsettled state of the law [on the issue of access] ... and the uncertain nature of the claims [made by the government and the press]...." *Id.* at 402–03

n. 4, 99 S.Ct. at 2917, 2918 n. 4. Under these circumstances, "there was no material deviation" from the majority's standard and procedural requirements. *Cf. id.*

**2.** Discounting the possible cumulative effect of the publicity is inconsistent with the precept of "our criminal justice system [which] permits, and even encourages, trial judges to be overcautious in ensuring that a defendant will receive a fair trial." *Gannett Co. v. DePasquale,* 443 U.S. 368, 379 n. 6, 99 S.Ct. 2898, 2905 n. 6, 61 L.Ed.2d 608 (1979) (Stewart, J.) (majority opinion).