396 F.3d 189
UNITED STATES of America, Appellee,v.Diomedes ALCANTARA, also known as Lenox Estefan, also known as Josie Alcantara, also known as Diomedes Alcantara, also known as El Princepe, also known as Fnu Lnu; Edwin Pujols, also known as El Gordito; Jose Gilberto Deleon; Melbin Garcia; Ramon Emilio Rodriguez; Edison Antonio Genao-Almanzar; Marco Perez; Gonzalo Gasso, Defendants,Carlos Goiry, also known as The Engineer, Defendant-Appellant.United States of America, Appellee,v.Luz Marina Munoz, also known as Tusa, Defendant-Appellant.
No. 02-1010.
No. 03-1061.
United States Court of Appeals, Second Circuit.
Argued: March 9, 2004 and May 18, 2004.
Decided: January 24, 2005.

COPYRIGHT MATERIAL OMITTED Anthony L. Ricco (John M. Rodriguez, on the brief), New York, NY, for Defendant-Appellant Carlos Goiry.
John A. Cirando, D.J. & J.A. Cirando, Esq., Syracuse, NY, for Defendant-Appellant Luz Marina Munoz.
Kim A. Berger & Miriam H. Baer, Assistant United States Attorneys (Marc L. Mukasey, Assistant United States Attorney, of counsel; James B. Comey & David N. Kelley, United States Attorneys for the Southern District of New York, on the briefs), New York, NY, for Appellee.
Before: WALKER, Chief Judge, CARDAMONE, WINTER, STRAUB, and LAY,* Circuit Judges.
STRAUB, Circuit Judge.

1
Defendant-Appellant Carlos Goiry appeals from a judgment entered on January 10, 2002, by the United States District Court for the Southern District of New York (Shirley Wohl Kram, Judge), convicting him, after a guilty plea, of conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846. The District Court sentenced Goiry to 135 months' imprisonment, to be followed by five years' supervised release, and a $100 mandatory special assessment. Defendant-Appellant Luz Marina Munoz appeals from a judgment entered by the same court on October 22, 2002, convicting Munoz, after a guilty plea, of conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 846. The District Court sentenced Munoz to 46 months' imprisonment, to be followed by four years' supervised release, and a $100 special assessment.

2
Oral arguments were heard in the appeals of the Munoz and Goiry cases by two panels of this court on March 9, 2004, and May 18, 2004, respectively.1 We have consolidated these cases for purposes of disposition on appeal because they raise a similar issue. In both cases, the District Court conducted important criminal proceedings in the robing room2 rather than in the open courtroom. Munoz entered her plea in the robing room and Goiry was sentenced in the robing room.

3
The public and press have a qualified First Amendment right of access to plea and sentencing proceedings. United States v. Haller, 837 F.2d 84, 86-87 (2d Cir.1988); In re Washington Post Co., 807 F.2d 383, 389 (4th Cir.1986). Therefore, "[t]he power to close a courtroom where proceedings are being conducted during the course of a criminal prosecution ... is one to be very seldom exercised, and even then only with the greatest caution, under urgent circumstances, and for very clear and apparent reasons." United States v. Cojab, 996 F.2d 1404, 1405 (2d Cir.1993). Before excluding the public from such proceedings, district courts must make findings on the record demonstrating the need for the exclusion. Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13-14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); Haller, 837 F.2d at 87. In addition, two decades ago, we established procedures for providing notice to the public that must be followed before closing a proceeding to which a First Amendment right of access attaches. To ensure that members of the public have notice that a motion to close the courtroom has been made, and have an opportunity to challenge the closure, a closure motion — whether made by a party or by the court sua sponte — must be docketed in the public docket files maintained in the court clerk's office. See In re The Herald Co., 734 F.2d 93, 102-03 (2d Cir.1984).

4
Here, the District Court apparently decided sua sponte to conduct Goiry's sentencing and Munoz's plea proceeding in the robing room, and did not provide notice to the public of its intention to close the proceedings as is required by Herald. In neither case did the court make findings on the record demonstrating the need for closure. There is no indication in the record of either case that there were circumstances present that would warrant closed proceedings. The public and press have a right to trust that the rules and procedures we have established will be followed. Therefore, in the exercise of our supervisory powers, we remand both cases to the District Court for further proceedings to be held in the public courtroom.

5
We also conclude that conducting Munoz's plea proceeding in the robing room violated Federal Rule of Criminal Procedure 11, which requires that such proceedings be conducted in "open court," and that conducting Goiry's sentencing in the robing room violated 18 U.S.C. § 3553(c), which requires that the District Court state in "open court" its reasons for imposing the sentence. Although we need not reach those issues because we are remanding both cases under our supervisory powers, we believe Rule 11 and § 3553(c)'s were clearly violated and thus address the issues to provide guidance to district courts.

BACKGROUND
I. LUZ MARINA MUNOZ

6
On December 19, 2001, Munoz pleaded guilty to a single count of conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 846. The transcript of the plea proceeding indicates that it was held in the District Court's robing room,3 and the parties agree that the proceeding indeed occurred in the robing room.

7
No motion to close the plea proceeding was docketed by the District Court on the public docket sheet maintained by the clerk's office. Rather, the docket sheet indicates that on November 30, 2001, the court ordered "that the pre-trial conference in this matter is adjourned ... until 12/19/01 at 2:00 p.m. in Room 906, 40 Centre Street, New York, New York." Room 906 is the District Court's courtroom. The docket sheet does not indicate the fact that Munoz's plea proceeding was instead held in the robing room.

8
The transcript from Munoz's plea proceeding demonstrates that the District Court conducted a thorough plea colloquy. In response to questions from the court, Munoz indicated that she was aware of the nature of the proceedings, understood the rights she was waiving by pleading guilty, and was satisfied with her attorney. She further indicated that she had discussed the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") with her attorney, and was aware of the minimum and maximum penalties applicable to the charge to which she was pleading guilty. She then described her participation in a conspiracy to distribute cocaine, and pleaded guilty to the count charged.

9
On June 26, 2002, six months after the guilty plea, the District Court conducted an evidentiary hearing to determine if Munoz was entitled to "safety-valve" relief. See 18 U.S.C. § 3553(f)(1)-(5); U.S.S.G. §§ 2D.1.1(b)(6), 5C1.2 (2001). At this hearing, which was held in the courtroom, Munoz admitted that she was guilty of the offense with which she had been charged and described in detail her involvement in the crime. On October 7, 2002, the District Court held that Munoz had truthfully disclosed all the information she had regarding her offense and was entitled to safety-valve relief.

10
On October 9, 2002, the court sentenced Munoz to 46 months' imprisonment, to be followed by four years' supervised release, and a $100 special assessment. It appears that Munoz's sentencing proceeding was held in the courtroom.

11
On November 15, 2002, Munoz sent a letter to the District Court in which she stated that she wanted to appeal but "didn't have the support of [her] attorney." Although Munoz did not file a notice of appeal within 10 days of judgment as required by Federal Rule of Appellate Procedure 4(b)(1)(A), the District Court found that Munoz had made a sufficient showing of "excusable neglect or good cause," and extended the time for filing to 30 days. See Fed. R.App. P. 4(b)(4).

12
Munoz did not object in the District Court to the fact that her plea proceeding was held in the robing room. However, on appeal, Munoz argues that the District Court's acceptance of her guilty plea in the robing room instead of in the open courtroom violated Federal Rule of Criminal Procedure 11 and her Sixth Amendment right to a public trial. She also argues that her plea should be vacated because she received ineffective assistance of counsel.

II. CARLOS GOIRY

13
On October 6, 2000, Goiry appeared before Magistrate Judge Kevin Nathaniel Fox and pleaded guilty to conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846.4 After conducting a thorough plea proceeding in the courtroom, Magistrate Judge Fox stated his intention to recommend to the District Court that Goiry's guilty plea be accepted. By an order dated April 16, 2001, the District Court accepted Goiry's plea.

14
Before sentencing, the United States Probation Office prepared a presentence investigation report ("PSR"). The PSR determined that Goiry's base offense level was 38 under U.S.S.G. § 2D1.1(c)(1) (2000) based on drug quantity, and that Goiry was entitled to a three-level reduction under U.S.S.G. § 3E.1.1(a) and (b) based on his timely plea and acceptance of responsibility. The PSR did not recommend any adjustments for Goiry's role in the offense. The PSR further determined that Goiry, under the Guidelines, had a Criminal History Category of I, and based on an adjusted offense level of 35, determined that Goiry's Guidelines range was 168 to 210 months. After the PSR was prepared, Goiry satisfied the requirements for safety-valve relief, see 18 U.S.C. § 3553(f)(1)-(5); U.S.S.G. §§ 2D.1.1(b)(6), 5C1.2, which resulted in a two-level reduction in offense level and a Guidelines range of 135 to 168 months.

15
Prior to sentencing, Goiry moved for a two-level "minor role" reduction under U.S.S.G. § 3B1.2(b), and for a downward departure from the applicable Guidelines range on the grounds that his health was poor and that he had substantially assisted the government. The government opposed both motions.

16
The District Court held Goiry's sentencing proceeding on December 19, 2001, and the transcript of the proceeding indicates that the District Court sentenced Goiry in the robing room.5 The government agreed at oral argument before this Court that the proceeding occurred in the robing room. The docket sheet provides no notice of any motion to close the proceeding to the public. Indeed, the docket sheet provides no notice of the date on which Goiry was to be sentenced. The docket sheet indicates only that Goiry was sentenced on December 19, 2001, and does not state that the sentencing occurred in the robing room.

17
There is no indication in the record that Goiry objected to the location of his sentencing proceeding. At sentencing, the court denied Goiry's request for a minor role adjustment, and his motion for a downward departure. Regarding the minor role request, the court stated: "I will indicate for the record, then, that he has not demonstrated a minor role in the criminal activity, that he is not less culpable than the average participant in the offense, and accordingly a two-level decrease is not warranted." The court made no other findings regarding Goiry's role in the offense. The court did not adopt the facts set forth in the PSR during the sentencing proceeding, and did not include a statement to that effect in the written judgment. Goiry was sentenced to a term of 135 months' imprisonment, five years' supervised release, and a $100 special assessment.

18
On appeal, Goiry argues that the District Court erred in declining to grant him a two-level reduction for his minor role in the offense. According to Goiry, the District Court denied his motion for a minor role adjustment "without providing a discernable basis for its ruling on the record," and applied the wrong standard in denying the reduction. Goiry did not object below, and does not object now, to the fact that he was sentenced in the robing room.

DISCUSSION

19
I. RIGHT OF ACCESS TO PLEA AND SENTENCING PROCEEDINGS

20
In Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court recognized that the public and press have a qualified First Amendment right to attend criminal trials. "Underlying the First Amendment right of access to criminal trials is the common understanding that a major purpose of that Amendment was to protect the free discussion of governmental affairs." Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 604, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (internal quotation marks omitted). The First Amendment right of access to criminal trials "ensure[s] that this constitutionally protected discussion of governmental affairs is an informed one." Id. at 605, 102 S.Ct. 2613 (internal quotation marks omitted). The Court in Globe Newspaper Co. explained the importance of public access to criminal proceedings to the functioning of the judicial process:

21
[T]he right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self-government.

22
Id. at 606, 102 S.Ct. 2613 (footnotes omitted); see also Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("Press-Enterprise I") ("The open trial ... plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."); Richmond Newspapers, 448 U.S. at 569, 100 S.Ct. 2814 ("Both Hale in the 17th century and Blackstone in the 18th saw the importance of openness to the proper functioning of a trial; it gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality."); In re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682 (1948) ("[T]he [public trial] guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.").

23
The Supreme Court has held further that the First Amendment right of access extends beyond simply the trial phase of a criminal prosecution. In Press-Enterprise I, the Court held that the public has a right to observe the examination of jurors during voir dire. 464 U.S. at 510-13, 104 S.Ct. 819; see also ABC, Inc. v. Stewart, 360 F.3d 90, 98-100 (2d Cir.2004). Two years later, in Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("Press-Enterprise II"), the Supreme Court concluded that the right of access extends to a preliminary hearing in a criminal case.

24
In Press-Enterprise II, the Supreme Court "formulated a two-pronged inquiry for evaluating whether particular proceedings should enjoy openness." Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 92 (2d Cir.2004). The Court explained: In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because, a tradition of accessibility implies the favorable judgment of experience, we have considered whether the place and process have historically been open to the press and general public.

25
....

26
Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.

27
Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735 (citations and internal quotation marks omitted). "This analysis has been summarized as requiring examination of both `logic' and `experience' in establishing the public's and press's qualified First Amendment right of access." Hartford Courant Co., 380 F.3d at 92 (citing ABC, 360 F.3d at 98 (quoting Globe Newspaper, 457 U.S. at 606, 102 S.Ct. 2613)).

28
Applying the above analysis, we have already held that the public and press have a qualified First Amendment right of access to plea proceedings and plea agreements. See United States v. Haller, 837 F.2d 84, 86-87 (2d Cir.1988) ("Plea hearings have typically been open to the public, and such access, as in the case of criminal trials, serves to allow public scrutiny of the conduct of courts and prosecutors. Moreover, the taking of a plea is the most common form of adjudication of criminal litigation." (citations omitted)); see also Washington Post v. Robinson, 935 F.2d 282, 288 (D.C.Cir.1991) ("In accord with the rulings of our sister Second, Fourth, and Ninth Circuits, we now find that plea agreements have traditionally been open to the public, and public access to them enhances both the basic fairness of the criminal [proceeding] and the appearance of fairness so essential to public confidence in the system. Therefore, there is a first amendment right of access to them." (citations and internal quotation marks omitted; alteration in original)); Oregonian Publ'g Co. v. U.S. Dist. Court for the Dist. of Or., 920 F.2d 1462, 1466 (9th Cir.1990) ("[T]he press and public have a qualified right of access to plea agreements and related documents under the first amendment."), cert. denied, 501 U.S. 1210, 111 S.Ct. 2809, 115 L.Ed.2d 982 (1991); United States v. Danovaro, 877 F.2d 583, 589 (7th Cir.1989) ("Trials and pre-trial hearings are open to the public under the First Amendment, unless some extraordinary circumstance requires their closure. Guilty pleas share some of the attributes of pre-trial proceedings and some of the attributes of trials. Public access to them reveals the basis on which society imposes punishment, especially valuable when the defendant pleads guilty while protesting innocence." (citations omitted)); In re Washington Post Co., 807 F.2d 383, 390 (4th Cir.1986) (holding that the right of access extends to plea hearings).

29
There is little doubt that the First Amendment right of access extends to sentencing proceedings as well. In In re Washington Post Co., the Fourth Circuit concluded that the public has a right of access to both plea and sentencing hearings. 807 F.2d at 390. The court explained:

30
Because the taking of a guilty plea serves as a substitute for a trial, it may reasonably be treated in the same manner as a trial for First Amendment purposes. Sentencing may also be viewed as within the scope of the criminal trial itself. Sentencing can occur before the termination of the trial proceeding, and, even if it occurs in a separate hearing, it clearly amounts to the culmination of the trial. Moreover, even if plea hearings and sentencing hearings are not considered a part of the trial itself, they are surely as much an integral part of a criminal prosecution as are preliminary probable-cause hearings, suppression hearings, or bail hearings, all of which have been held to be subject to the public's First Amendment right of access.

31
Id. at 389. Applying the two-prong inquiry of Press-Enterprise II, the court concluded:

32
[H]istorical and functional considerations weigh in favor of finding a First Amendment right of access here. Sentencings have historically been open to the public; while plea hearings do not have the same long tradition, they are typically held in open court. As to both, public access serves the important function of discouraging either the prosecutor or the court from engaging in arbitrary or wrongful conduct. The presence of the public operates to check any temptation that might be felt by either the prosecutor or the court to obtain a guilty plea by coercion or trick, or to seek or impose an arbitrary or disproportionate sentence.

33

Id.

34
The Seventh Circuit has also held that the public and press have a right of access to sentencing proceedings, see United States v. Eppinger, 49 F.3d 1244, 1253 (7th Cir.1995), and other circuits have held that the public and press have a right of access to various documents filed in connection with sentencing proceedings, see CBS, Inc. v. U.S. Dist. Court for the Cent. Dist. of Cal., 765 F.2d 823, 826 (9th Cir.1985) (finding a right of access to documents filed in connection with a motion to reduce a sentence); United States v. Santarelli, 729 F.2d 1388, 1390 (11th Cir.1984) ("[T]he public has a First Amendment right to see and hear that which is admitted into evidence in a public sentencing hearing.").6

35
These holdings are persuasive. First, historically, sentences have been imposed in open court.7 Numerous cases from over a century ago describe sentencing proceedings held in open court. See, e.g., Wilkerson v. Utah, 99 U.S. 130, 130-31, 25 L.Ed. 345 (1878) ("[T]he record also shows that the presiding justice in open court sentenced the prisoner as follows...."); Wright v. State, 103 Ala. 95, 15 So. 506, 507 (1894) ("The sentence can be pronounced only in open court, with the defendant present, and should be preceded by enquiring of the defendant if he has anything to say why the sentence of the law should not be pronounced."); Palmquist v. State, 30 Fla. 73, 11 So. 521, 522 (1892) ("The personal presence of the accused in open court when sentence was passed upon him is also shown."); State v. Chancellor, 32 S.C.L. (1 Strob.) 347 (1847) ("All sentences must be passed in open Court, and in the presence of the party. Exposure to the public eye is a material part of every sentence, and leads to much judicial consideration."); Washington v. State, 31 Tex.Crim. 84, 19 S.W. 900, 900 (1892) ("[Defendant Washington] was brought into open court to receive the sentence of the court in accordance with the previous verdict and judgment.").

36
Second, public access to sentencing proceedings "plays a significant positive role in the functioning" of the proceeding. Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. In Press-Enterprise II, the Supreme Court considered the positive role of public access to the functioning of preliminary hearings in California. At such hearings, where a magistrate determines whether probable cause exists, the accused has a right to personally appear, to be represented by counsel, to cross-examine witnesses, and to present exculpatory evidence. Id. at 12, 106 S.Ct. 2735. The Court found that preliminary hearings were "sufficiently like a trial" to justify the conclusion that public access "is essential to the proper functioning of the criminal justice system." Id. The Court also observed that the absence of a jury at preliminary hearings made the need for public access more compelling:

37
Similarly, the absence of a jury, long recognized as `an inestimable safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge,' makes the importance of public access to a preliminary hearing even more significant. `People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing.'

38
Id. at 12-13, 106 S.Ct. 2735 (citations omitted); see also Matthew Hale, The History of the Common Law of England 163 (Charles M. Gray ed., Univ. of Chicago Press 1971) (3d ed. 1739) ("[I]f the Judge be Partial, his Partiality and Injustice will be evident to all By-standers.").

39
As with a preliminary hearing, the sentencing phase of a case has similar features to a trial. The defendant personally appears, is represented by counsel, and can present evidence, call witnesses, and cross-examine government witnesses. In addition, as with preliminary hearings, the absence of a jury at sentencing increases the need for public access to the proceedings.

40
Members of the public have a strong interest in attending sentencing proceedings, and their attendance is important to the proper functioning of the judicial proceedings. Sentencing proceedings are of paramount importance to friends and family members of the defendant being sentenced. The proceedings are also extremely significant to victims of crimes, to family members of victims, and to members of the community in which the crime occurred. The Supreme Court has described the "community therapeutic value" of open proceedings in criminal cases. Richmond Newspapers, 448 U.S. at 570, 100 S.Ct. 2814; see also Press-Enterprise II, 478 U.S. at 13, 106 S.Ct. 2735 ("Criminal acts, especially certain violent crimes, provoke public concern, outrage, and hostility. `When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions.'" (quoting Press-Enterprise I, 464 U.S. at 509, 104 S.Ct. 819)). Access to sentencing proceedings — and to guilty plea proceedings — is particularly important because most cases do not go to trial. See In re The Herald Co., 734 F.2d 93, 98 (2d Cir.1984) ("It makes little sense to recognize a right of public access to criminal courts and then limit that right to the trial phase of a criminal proceeding, something that occurs in only a small fraction of criminal cases.").

41
There is no doubt that witnessing a sentencing in person is a more powerful experience than reading a transcript of the proceeding. A sentencing proceeding is a solemn occasion at which the judge has the weighty duty of determining the fate of another human being. A transcript of the proceeding does not convey the impact that the judge's words and actions have on the defendant and any friends or family members present. Furthermore, the ability to see the application of sentencing laws in person is important to an informed public debate over these laws. Observing the effect of laws that expand or contract the discretion of judges in imposing sentences in individual cases may provide a valuable perspective. See Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 85 (1998) (describing a sentencing proceeding under the Federal Sentencing Guidelines regime: "The observer who comes to the contemporary federal courtroom to witness the dramatic passing of judgment on a member of the community — to observe the drama of catharsis, appeals for mercy, appeals for severity, and the reasoned judgment that takes all of this into account — is sorely disappointed. That observer finds in today's federal courtroom precious little discussion of the human qualities of the victim or the defendant, of the inherently unquantifiable moral aspects of the defendant's crime, or of the type of sanction that would best achieve any of the purposes of sentencing.").

42
For these reasons, we conclude that "considerations of experience and logic," Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. 2735, support holding that, as with plea proceedings, a qualified First Amendment right of public access attaches to sentencing proceedings.

II. REQUIREMENTS FOR CLOSING PROCEEDINGS

43
Before closing a proceeding to which the First Amendment right of access attaches, "[a] district court must make `specific, on the record findings ... demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" United States v. Haller, 837 F.2d 84, 87 (2d Cir.1988) (quoting Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. 2735) (internal quotation marks omitted); see also Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. 819 ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."); United States v. Doe, 63 F.3d 121, 128 (2d Cir.1995) (setting forth the "four steps that a district court must follow in deciding a motion for closure").

44
In In re The Herald Co., 734 F.2d 93, 102 (2d Cir.1984), we established procedures for providing notice to the public that must be followed before closing a proceeding to which the public has a right to attend. We reasoned in Herald that "[s]ince by its nature the right of public access is shared broadly by those not parties to the litigation, vindication of that right requires some meaningful opportunity for protest by persons other than the initial litigants, some or all of whom may prefer closure." Id. We said that "it seems entirely inadequate to leave the vindication of a First Amendment right to the fortuitous presence in the courtroom of a public spirited citizen willing to complain about closure," and we noted that the Third Circuit had ruled, "in the exercise of its supervisory powers, that a closure motion must be docketed sufficiently in advance of a hearing on such motion to permit intervention by interested members of the public." Id. at 102 (citing United States v. Criden, 675 F.2d 550, 559 (3d Cir.1982)). Following the Third Circuit, we held

45
that a motion for courtroom closure should be docketed in the public docket files maintained in the court clerk's office. See Fed.R.Crim.P. 55; Fed.R.Civ.P. 79(a). The motion itself may be filed under seal, when appropriate, by leave of court, but the publicly maintained docket entries should reflect the fact that the motion was filed, the fact that the motion and any supporting or opposing papers were filed under seal, the time and place of any hearing on the motion, the occurrence of such hearing, the disposition of the motion, and the fact of courtroom closure, whether ordered upon motion of a party or by the Court sua sponte. Entries on the docket should be made promptly, normally on the day the pertinent event occurs.... We think this type of general public notice suffices to afford an adequate opportunity for challenge to courtroom closure.

46
Herald, 734 F.2d at 102-03 (footnote omitted);8 see Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 93 (2d Cir.2004) ("[D]ocket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment.... [T]he docketing of a hearing on sealing provides effective notice to the public that it may occur."); United States v. Cojab, 996 F.2d 1404, 1408 (2d Cir.1993) (stating that "a judge's robing room is not open court" and holding that the District Court failed to following Herald's notice procedures before holding a pretrial hearing in the robing room); Haller, 837 F.2d at 87 ("In re Herald requires ... that except in extraordinary circumstances the public have a means of learning that a closure or sealing order has been proposed or issued.").9

47
III. MUNOZ'S PLEA PROCEEDING AND GOIRY'S SENTENCING PROCEEDING

A. Failure to Comply with Herald

48
On December 19, 2001, the District Court held Munoz's plea proceeding, and Goiry's sentencing proceeding, in the robing room. It is unclear why these proceedings were not held in the open courtroom. There is no indication in the record of either case that a motion to close the proceedings was made in open court, either by the government or by the court sua sponte. Furthermore, in neither case does the docket sheet indicate that a motion to hold a closed proceeding was made. Instead, in Munoz's case, the docket sheet states that a "pre-trial conference" would be held in the courtroom on December 19, 2001. In Goiry's case, no notice of the sentencing proceeding was provided on the docket sheet. In neither case does the docket sheet state that the proceeding in fact occurred in the robing room. The government, while urging us to affirm in both cases, does not point to any reason for why the proceedings were held in the robing room. Instead, according to the government's brief, holding such proceedings in the robing room is "in accordance with Judge Kram's customary practice."

49
Because the District Court failed to comply with the Herald notice procedures before holding the plea and sentencing hearings in the robing room, and because the court failed to make findings demonstrating the need for closed proceedings, we, in the exercise of our supervisory powers, remand both cases for proceedings to be held in open court.

50
The government asserts that Munoz's robing room plea does not implicate First Amendment concerns because the transcript of Munoz's plea proceeding was not sealed and was available to the public. However, the fact that transcripts of Munoz's plea proceeding and Goiry's sentencing proceeding were later available to the public and press does not satisfy the First Amendment right of access. Recently, in ABC, Inc. v. Stewart, 360 F.3d 90, 95 (2d Cir.2004), the District Court had ordered that no member of the press could be present for jury voir dire, but that transcripts of the proceedings would be released to the public the following day. We rejected the government's argument that the order did not "entirely or even significantly impair[ ] the public's first amendment right of access but merely deprive[d] Appellants of the contemporaneity and the color and texture of the voir dire proceedings." Id. at 99 (internal quotation marks omitted; alteration in original). We stated: "The ability to see and to hear a proceeding as [it] unfolds is a vital component of the First Amendment right of access — not, as the government describes, an incremental benefit." Id.; see also id. at 99-100 ("`[D]ocumentary access is not a substitute for concurrent access, and vice versa.... [W]here a right of access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available. Such a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript.'" (quoting United States v. Antar, 38 F.3d 1348, 1360 n. 13 (3d Cir.1994))); id. at 100 ("The provision of a transcript ... does not somehow allow for a more lenient balancing test."); cf. United States v. Canady, 126 F.3d 352, 355, 362-63 (2d Cir.1997) (mailing verdict to parties after bench trial in criminal case violated the defendant's Sixth Amendment right to a public trial), cert. denied, 522 U.S. 1134, 118 S.Ct. 1092, 140 L.Ed.2d 148 (1998).

51
The government also argues that the robing room proceeding in Munoz's case was not actually closed to the public. According to the government's brief, Munoz and her attorney, and other parties who were scheduled to appear before Judge Kram, "assembled in Judge Kram's courtroom and awaited the courtroom Deputy Clerk's public call of the calendar." The government says that "nobody was denied access to Munoz's guilty plea and there is no indication that the District Court would have denied access to, for example, the press or a family member who wished to observe the proceeding."

52
However, the government presents no evidence in the form of affidavits or testimony that the Munoz and Goiry cases were indeed called in open court. The transcript of both proceedings begins: "(In the robing room)." In any event, even if the cases were called in open court and the parties then proceeded to the robing room, we are unwilling to conclude that that fact alone transforms the robing room proceeding into a proceeding which is open to the public.

53
Members of the public understand that they are free to enter a courtroom. Most would not view a judge's robing room as a space to which they have a right of access. It seems quite unlikely that a spectator in the courtroom would have felt at liberty to follow the parties into the robing room under the circumstances. In addition, even if the Munoz and Goiry cases were called in the open courtroom, members of the public or press would have no way of knowing that what was about to transpire in the robing room might be of interest to them. The record does not indicate that the District Court stated in open court its decision to close the proceedings; nor did the court offer an opportunity for anyone present to object.

54
Although no member of the public or press has complained in either the Munoz or Goiry case, the purpose of Herald's notice procedures is to provide the opportunity for an interested member of the public to complain. See Herald, 734 F.2d at 102 ("[I]t seems entirely inadequate to leave the vindication of a First Amendment right to the fortuitous presence in the courtroom of a public spirited citizen willing to complain about closure.").

55
For these reasons, we conclude that conducting Munoz's plea proceeding and Goiry's sentencing proceeding in the robing room infringed on the First Amendment right of access of the public and press, and could be justified only if the District Court complied with the notice requirements set forth in Herald and also made "specific, on the record findings ... demonstrating that closure [was] essential to preserve higher values and [was] narrowly tailored to serve that interest." Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. 2735 (internal quotation marks omitted).

56
The District Court failed to provide notice to the public of its plan to hold closed proceedings as is required by Herald. Based on the unique circumstances presented by the Munoz and Goiry cases, we, in the exercise of our supervisory powers, vacate the plea and sentencing proceedings not held in open court in these cases and remand both cases to the District Court for further proceedings to be held in the public courtroom. See United States v. Johnson, 221 F.3d 83, 96 (2d Cir.2000) ("`Guided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.'" (quoting United States v. Hasting, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983))), cert. denied, 533 U.S. 953, 121 S.Ct. 2599 (2001); Daye v. Attorney General, 712 F.2d 1566, 1571 (2d Cir.1983) ("[F]ederal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts...."), cert. denied, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). We have noted that "generally the exercise of supervisory power arises in the context of requests by defendants to vacate convictions," Johnson, 221 F.3d at 96, but we have also used our supervisory powers before to remand for resentencing, see, e.g., United States v. Ming He, 94 F.3d 782, 792 (2d Cir.1996) ("Our supervisory authority extends to sentencing....").

57
We are mindful that the Supreme Court has instructed that courts of appeals should not use their supervisory powers to circumvent the harmless error rule of Federal Rule of Criminal Procedure 52. See, e.g., Bank of Nova Scotia v. United States, 487 U.S. 250, 254-55, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). There is no circumvention of Rule 52 here, however, as more than the rights of the defendants and the government are at stake. The error is not harmless when viewed from the perspective of the public and press. Indeed, the error harms the integrity of our federal judicial system as a whole. Because of the fundamental nature of this error, we consider this to be one of those rare situations where it is appropriate to exercise our supervisory powers. Holding these significant criminal proceedings behind closed doors — without notice to the public or any statement of reasons for the closure — is inconsistent with our open system of justice. The remedy we provide in these cases, vacating Munoz's plea and remanding Goiry's case for resentencing, is appropriate because the interests of the defendants are squarely aligned with protecting the rights of the public and press. Munoz asks us to vacate her plea on the ground that her right to a public trial was violated. Goiry, while not arguing on appeal that his public trial rights were violated by the robing room sentencing, nonetheless seeks a remand for resentencing on the ground that the District Court's findings of fact at sentencing were inadequate. There is no indication in the record that Goiry wanted to be sentenced in the robing room.10 Accordingly, in the exercise of our supervisory powers, we remand both cases to the District Court for further proceedings to be held in the public courtroom.

58
Because we choose to remand the cases under our supervisory powers based on the District Court's failure to comply with Herald, we do not address Munoz's argument that the robing room plea proceeding violated her Sixth Amendment right to a public trial.11

59
Munoz also argues that the robing room plea proceeding violated Federal Rule of Criminal Procedure 11's requirement that such proceedings be conducted in "open court." Although we need not reach that issue because we are remanding in any event, because we believe Rule 11 was clearly violated here, we address the issue to provide guidance to district courts. We also believe 18 U.S.C. § 3553(c)'s requirement that a District Court state in "open court" the reasons for imposing a sentence was clearly violated by holding Goiry's sentencing proceeding in the robing room, and thus we address that issue below as well.

B. Violation of Rule 11

60
Federal Rule of Criminal Procedure 11 requires district courts to conduct guilty plea proceedings in "open court." See Fed.R.Crim.P. 11(b)(1) (2004) (stating that before accepting a guilty plea, the court "must address the defendant personally in open court" (emphasis added)); Fed.R.Crim.P. 11(b)(2) (requiring the court to "address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises" (emphasis added)); Fed.R.Crim.P. 11(c)(2) (stating that plea agreement must be disclosed "in open court when the plea is offered, unless the court for good cause allows the parties to disclose the plea agreement in camera" (emphasis added)).

61
Although Rule 11 is very clear that guilty plea proceedings must be carried out in open court, the Rule does not include a definition of the term.12 The government argues that Rule 11's open court requirement was satisfied in Munoz's case because no one was denied access to the robing room, the proceedings were recorded, and the records were not sealed.

62
First, as discussed above, we do not view the robing room a space open to the public. Second, recording the plea proceeding and providing public access to the transcript does not satisfy the open court requirement. The provision of Rule 11 relating to the rejection of plea agreements provides that if the court rejects a plea agreement, it must advise the defendant of various matters "on the record and in open court (or, for good cause, in camera)." Fed.R.Crim.P. 11(c)(5) (emphasis added). This sentence indicates that the recording of proceedings is a separate requirement from the open court requirement. In addition, Rule 11 includes the requirement that all plea proceedings be "recorded by a court reporter or by a suitable recording device." Fed.R.Crim.P. 11(g). If the open court requirement were satisfied simply by recording the proceedings, section (g) would make the open court language in the rule unnecessary. See id. An examination of the history of the Federal Rules of Criminal Procedure confirms that Rule 11's requirement that plea proceedings be conducted in "open court" is not satisfied by transcribing the proceeding behind closed doors and then making the transcript available to the public. The first version of the Federal Rules of Criminal Procedure was adopted in 1944. At that time, Rule 11 contained no reference to "open court." See Fed.R.Crim.P. 11 (1944) (codified at 18 U.S.C. § 687 (1946)). However, several other rules contained "open court" requirements. For example, the original version of Federal Rule of Criminal Procedure 10 provided: "Arraignment shall be conducted in open court and shall consist of reading the indictment or information to the defendant or stating to him the substance of the charge and calling on him to plead thereto," Fed.R.Crim.P. 10 (1944) (emphasis added), and the Advisory Committee's Note to Rule 10 said that this requirement "state[d] the prevailing practice," id. advisory committee's note (1944). Federal Rule of Criminal Procedure 31 provided that the verdict "shall be returned by the jury to the judge in open court," Fed.R.Crim.P. 31(a) (1944) (emphasis added), and the Advisory Committee's Note said that "[t]his rule is a restatement of existing law and practice," id. advisory committee's note (1944).13

63
It is clear that "open court" as used in these rules refers to a courtroom to which the public has access. The arraignment and the reading of the verdict have historically been conducted in the public courtroom, and we believe the Federal Rules of Criminal Procedure were intended to codify that practice. See Advisory Committee on Rules of Criminal Procedure, Federal Rules of Criminal Procedure, Preliminary Draft 46 (1943) (stating that "[a]ccording to Bishop, `It [arraignment] consists of reading the indictment to him, and asking him, in open court, whether or not he is guilty ....'" (quoting 2 Joel P. Bishop, New Criminal Procedure § 728 (2d ed.1913))); see also 1 James F. Stephen, A History of the Criminal Law of England 275 (London, McMillan 1883) ("[I]n all common cases the pleadings in a criminal trial have always consisted, and still consist, of an indictment engrossed on parchment, and a plea given by the accused person orally in open court, of guilty or not guilty."); 4 William Blackstone, Commentaries *354 ("[The jury] cannot, in a criminal case, give a privy verdict. But an open verdict may be either general, guilty, or not guilty; or special...." (footnote omitted)).14

64
In 1974, Rule 11 was amended to add the requirement that the court address the defendant "personally in open court." Fed.R.Crim.P. 11 (1974) (codified at 18 U.S.C. app. (1976)). We conclude that the phrase "in open court" has the same meaning here as it does in the other rules — i.e., in a courtroom to which the public has access. One purpose of the 1974 amendments to Rule 11 was to "give recognition to the propriety of plea discussions" and "to bring the existence of a plea agreement out into the open in court." Fed.R.Crim.P. 11 advisory committee's note (1974); see also id. (noting the "risk of real or apparent unfairness" that can arise from plea bargains occurring in an "informal and largely invisible manner"). That purpose is best served by holding that Rule 11 requires district courts to conduct plea proceedings in the public courtroom.15

65
Accordingly, it is clear that holding Munoz's plea proceeding in the robing room violated Rule 11. Because we are remanding under our supervisory powers, we do not decide whether this Rule 11 error would provide a basis for vacating Munoz's plea.

C. Violation of 18 U.S.C. § 3553

66
We also hold that imposing Goiry's sentence in the robing room violated 18 U.S.C. § 3553(c)'s requirement that "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c) (2000) (emphasis added).

67
In United States v. Molina, 356 F.3d 269, 276-77 (2d Cir.2004), we held that § 3553(c)'s requirement that a district court state in open court the reasons for imposing a sentence was not satisfied by a statement of reasons included later in a written judgment. In Molina, the District Court imposed the sentence in the open courtroom, but in imposing a two-level enhancement based on the defendant's role as a leader, the court stated simply, "I'll grant the two-point enhancement at this time." Id. at 276. The District Court expressly adopted the factual findings of the PSR in the statement of reasons set out in its written judgment but did not adopt the PSR in open court. Id. at 276-77. We stated:

68
Congress had goals in mind when it enacted § 3553(c), including: (1) to inform the defendant of the reasons for his sentence, (2) to permit meaningful appellate review, (3) to enable the public to learn why defendant received a particular sentence, and (4) to guide probation officers and prison officials in developing a program to meet defendant's needs. See S.Rep. No. 98-225, at 79-80 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3262-63; United States v. Carey, 895 F.2d 318, 325 (7th Cir.1990). We are concerned that these goals may not be fully met when the fact-finding to support a sentence enhancement is set out only in the written judgment.

69
Molina, 356 F.3d at 277 (emphasis added).

70
Under Molina, the fact that the transcript from Goiry's sentencing was later available to the public does not satisfy § 3553(c)'s requirement that the District Court state at the time of sentencing "in open court" the reasons for the sentence. Therefore, imposing Goiry's sentence in the robing room violated § 3553(c).

71
In Molina, however, despite finding that the court violated § 3553(c)'s open court requirement, we did not remand for resentencing. Because the error had not been raised below, we reviewed for plain error. See id. at 278. We concluded that the findings of fact contained in the PSR, which were adopted by the District Court in its written judgment, along with testimony at the sentencing hearing, were sufficient to support application of the role enhancement. Id. at 277. Under those circumstances, we held that the defendant had failed to meet the prejudice prong of the plain error test. Id. at 278.

72
Because we are remanding Goiry's case for resentencing under our supervisory powers, we do not decide whether the violation of 18 U.S.C. § 3553(c)'s open court requirement would alone provide a basis for resentencing in Goiry's case.16

CONCLUSION

73
For the reasons stated above, we vacate Munoz's plea and remand the case for proceedings consistent with this opinion. In addition, we vacate Goiry's sentence and remand his case for resentencing proceedings consistent with this opinion.

Notes:

*
The Honorable Donald P. Lay, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation

1
Munoz's appeal was heard by Chief Judge Walker, and Circuit Judges Cardamone and Straub. Goiry's appeal was heard by Circuit Judges Winter, Straub, and Lay

2
Robing rooms are rooms adjacent to courtrooms where judges store their robes and place them on before entering the courtroom. Court-related conferences are occasionally conducted in robing rooms

3
The transcript of the plea hearing begins with the statement: "(In robing room)."

4
Goiry consented to having Magistrate Judge Fox conduct the proceeding

5
The transcript of Goiry's sentencing proceeding, like Munoz's plea proceeding, begins with the statement: "(In the robing room)."

6
Courts have generally held, however, that there is no First Amendment right of access to pre-sentence reportsSee, e.g., United States v. Corbitt, 879 F.2d 224, 237 (7th Cir.1989).

7
Historically, Sentences were often imposed immediately after the jury returned a guilty verdict in open courtSee, e.g., 1 James F. Stephen, A History of the Criminal Law of England 457 (London, McMillan 1883) ("If the prisoner is convicted he is sentenced usually at once."); 4 William Blackstone, Commentaries *368 ("For when, upon a capital charge, the jury have brought in their verdict guilty, in the presence of the prisoner; he is either immediately, or at a convenient time soon after, asked by the court, if he has any thing to offer why the judgment should not be awarded against him."); see also 1 Peleg W. Chandler, American Criminal Trials 303-415 (Boston, Charles C. Little & James Brown 1841), reprinted in 3 Notable Historical Trials 50 (Justin Lovill ed., 1999) (describing the Boston Massacre trial of 1770: "The jury withdrew for about two hours and a half, and then returned into court with a verdict of Not Guilty as to all the prisoners except Killroy and Montgomery, who were found ... Guilty of manslaughter. They prayed the benefit of clergy, which was allowed them, and thereupon they were each of them burned in the hand, in open court, and were discharged." (footnote omitted)).

8
InHerald, we noted that there might be "extraordinary situations where even the contemporaneous notation in the docket that courtroom closure has been sought or has occurred could create a substantial risk of harm to an individual" and said that our opinion would "not foreclose a trial judge, in unusual circumstances, from ordering that docketing of closure proceedings be delayed for some brief interval, provided that the interval ends upon a specified date or the occurrence, within a reasonable time, of a specified event and that the judge's reasons for delaying docketing of the closure proceedings are set forth, under seal if appropriate, for eventual appellate scrutiny." Herald, 734 F.2d at 102-03 n. 7.

9
U.S. Department of Justice guidelines generally prohibit a government attorney from consenting to a closed plea or sentencing proceeding when the public has not been given notice of the proposed closure. The guidelines recognize "the vital public interest in open judicial proceedings" and the government's "general overriding affirmative duty to oppose their closure." 28 C.F.R. § 50.9 (2004). The guidelines, which apply to,inter alia, plea proceedings and sentencing proceedings, id. § 50.9(a), provide that:
(c) A Government attorney shall not move for or consent to closure of a proceeding covered by these guidelines unless:
(1) No reasonable alternative exists for protecting the interests at stake;
(2) Closure is clearly likely to prevent the harm sought to be avoided;
(3) The degree of closure is minimized to the greatest extent possible;
(4) The public is given adequate notice of the proposed closure; and, in addition, the motion for closure is made on the record, except where the disclosure of the details of the motion papers would clearly defeat the reason for closure specified under paragraph (c)(6) of this section;
(5) Transcripts of the closed proceedings will be unsealed as soon as the interests requiring closure no longer obtain; and
(6) Failure to close the proceedings will produce;
(i) A substantial likelihood of denial of the right of any person to a fair trial; or
(ii) A substantial likelihood of imminent danger to the safety of parties, witnesses, or other persons; or
(iii) A substantial likelihood that ongoing investigations will be seriously jeopardized.
Id. § 50.9(c); see also United States Attorney's Manual § 9-5.150 (2004) ("No motion for such a closure or consent to the closure of criminal proceedings may be sought or agreed to by a Department employee without the express authorization of the Deputy Attorney General.... There is a strong presumption against closing proceedings, and the Department foresees very few cases in which closure would be warranted. Only when a closed proceeding is plainly essential to the interests of justice should a government attorney seek authorization from the Deputy Attorney General to move for or consent to closure of a judicial proceeding.").
(5) Transcripts of the closed proceedings will be unsealed as soon as the interests requiring closure no longer obtain; and
(6) Failure to close the proceedings will produce;
(i) A substantial likelihood of denial of the right of any person to a fair trial; or
(ii) A substantial likelihood of imminent danger to the safety of parties, witnesses, or other persons; or
(iii) A substantial likelihood that ongoing investigations will be seriously jeopardized.
Id. § 50.9(c); see also United States Attorney's Manual § 9-5.150 (2004) ("No motion for such a closure or consent to the closure of criminal proceedings may be sought or agreed to by a Department employee without the express authorization of the Deputy Attorney General.... There is a strong presumption against closing proceedings, and the Department foresees very few cases in which closure would be warranted. Only when a closed proceeding is plainly essential to the interests of justice should a government attorney seek authorization from the Deputy Attorney General to move for or consent to closure of a judicial proceeding.").

10
We hold that at resentencing, the District Court shall not impose on Goiry a greater sentence than was previously imposed

11
For the same reason, we do not address Munoz's argument that she was denied effective assistance of counsel during the proceedings below

12
Black's Law Dictionary defines "open court" as:

1
A court that is in session, presided over by a judge, attended by the parties and their attorneys, and engaged in judicial business. •Open court usu[ally] refers to a proceeding in which formal entries are made on the record. The term is distinguished from a court that is hearing evidence in camera or from a judge that is exercising merely magisterial powers. 2. A court session that the public is free to attend. • Most state constitutions have open-court provisions guaranteeing the public's right to attend trials.
Black's Law Dictionary 1118 (7th ed.1999).

13
The 1944 version of other rules contained "open court" language as wellSee, e.g., Fed.R.Crim.P. 6(f) (1944) ("The indictment shall be returned by the grand jury to a judge in open court." (emphasis added)); Fed.R.Crim.P. 7(b) (1944) ("An offense which may be punished by imprisonment for a term exceeding one year or at hard labor may be prosecuted by information if the defendant, after he has been advised of the nature of the charge and of his rights, waives in open court prosecution by indictment." (emphasis added)); Fed.R.Crim.P. 26 (1944) ("In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an act of Congress or by these rules." (emphasis added)).

14
Black's Law Dictionary defines "privy verdict" as:
A verdict given after the judge has left or adjourned the court, and the jury, having agreed, obtains leave to give its verdict privately to the judge out of court so that the jurors can be delivered from their confinement. . Such a verdict was of no force unless afterwards affirmed in open court.
Black's Law Dictionary 1555 (7th ed.1999).

15
This reading is confirmed by an Advisory Committee's Note on the 2002 amendments to Federal Rule of Criminal Procedure 1. Rule 1 defines "Court" as "a federal judge performing functions authorized by law." Fed.R.Crim.P. 1(b)(2) (2004). The 2002 note states that "the Committee intends that the term `court' be used principally to describe a judicial officer, except where a rule uses the termin a spatial sense, such as describing proceedings in `open court.'" Fed.R.Crim.P. 1 advisory committee's note (2002) (emphasis added).

16
Although Goiry does not complain about the fact that he was sentenced in the robing room, he does argue on appeal that the District Court did not make adequate findings to support denial of his request for a minor role reduction under U.S.S.G. § 3B1.2(b). Goiry asserts that the District Court did not adopt any of the factual findings in the PSR — at the time of sentencing or in the written judgment — and "absent from the record is any indication of the factual basis upon which the court denied Goiry's application for a mitigating role adjustment." Goiry also claims that the District Court applied the wrong standard in denying his role reduction motion. According to Goiry, the District Court's statements indicate that it was comparing his role to the role of other participants in the conspiracy, rather than to the role of the average participant in such conspiracies in general
We do not address this issue because we are vacating Goiry's sentence and remanding the case for resentencing for other reasons. In addition, we do not address any effects of United States v. Booker, 2005 WL 50108, ___ U.S. ___, 125 S.Ct. 738, ___ L.Ed.2d ___ (Jan. 12, 2005), 2005 U.S. LEXIS 628, on the Munoz and Goiry cases because we are remanding for new proceedings in any event.