# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 12-1673

———————————————

United States of America

*Plaintiff - Appellee*

v.

Armon Thompson, also known as Bin Laden

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Western District of Missouri - Kansas City

——————————

Submitted: November 16, 2012
Filed: April 23, 2013

——————————

Before SMITH, BEAM, and GRUENDER, Circuit Judges.

——————————

BEAM, Circuit Judge.

Armon Thompson appeals from the district court's[1] sentence imposed following Thompson's guilty plea to one count of being a felon in possession of a firearm. On appeal, Thompson claims the district court violated his Sixth Amendment right to a

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

public trial at the sentencing hearing when the court closed the courtroom during the testimony of one witness. Because we find no constitutional infirmity, we affirm.

## I.    BACKGROUND

Thompson pled guilty to one count of being a felon in possession of a firearm following his arrest on December 2, 2010. On that date, officers were conducting a homicide investigation in St. Joseph, Missouri, and were attempting to locate a key suspect. Thompson accompanied the suspect on that date and officers discovered both men in the basement of a residence, along with several firearms, some of which, following ballistic and DNA testing, were suspected to have been used in the homicide under investigation. Officers arrested both men on outstanding felony warrants and took them in for questioning in relation to the homicide.

Pending sentencing, Thompson was held at the St. Claire County Jail in Osceola, Missouri. At least for part of Thompson's time in jail, he was housed with Justin Campbell. At Thompson's sentencing hearing, Detective Scott Coates testified that he interviewed Campbell after learning that Campbell might have information regarding the homicide. Detective Coates testified that during the interview, Campbell told Detective Coates that while Campbell was housed with Thompson, Thompson told him that he, Thompson, was involved in a drive-by shooting in St. Joseph, along with another friend who had been charged with the murder. Campbell also relayed information to Detective Coates about the shooting as told to him by Thompson that corroborated existing evidence in the case. Detective Coates further testified that Campbell expressed concern for his own safety should Thompson find out that Campbell had given the information.

Following Detective Coates' testimony, just prior to calling Campbell to the witness stand, the government requested that the courtroom be cleared given Campbell's expressed concern for his safety. Defense counsel pointed out to the court

-2-

that the people in the gallery were all family of Thompson; that no one in the courtroom was related to anyone else.  The court asked whether "somebody from the press" was there, and when the court learned that there was not, it granted the request to clear the courtroom, specifically excluding a member of the court staff who remained in the gallery.  At that point, the parties approached the bench and defense counsel made a record on the matter, objecting to any closure because of the public nature of the hearing, noting that everyone cleared were family members of Thompson and arguing that there was no evidence "of [the people being cleared] being in a position to threaten or harm Mr. Campbell."  The court responded, "[t]he allegations are that he was a gang member and was involved in drive-by shootings so I'm going to overrule your objection."  The courtroom was cleared and Campbell testified.

The portion of Campbell's testimony relevant here corroborated that of Detective Coates.  Campbell reiterated that Thompson told Campbell that he, Thompson, had been involved in a drive-by shooting and conveyed details to Campbell about surrounding events that were supported by evidence in the homicide case.  The district court found Campbell credible and considered Campbell's testimony in its sentencing calculation, specifically its determinations regarding suggested enhancements arising from Thompson's use or possession of any firearm or ammunition in connection with another felony offense that resulted in death.  The court sentenced Thompson to 120 months' imprisonment.  Thompson appeals, claiming that when the court cleared the courtroom prior to Campbell's testimony, it violated Thompson's Sixth Amendment right to a public trial, a structural error that is not amenable to harmless error review.

## II.    DISCUSSION

A threshold question is whether the right to a public trial in criminal cases under the Sixth Amendment extends to sentencing hearings.  The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

The public trial right of the Sixth Amendment has long been viewed as "'a safeguard against any attempt to employ our courts as instruments of persecution.'" United States v. Thunder, 438 F.3d 866, 867 (8th Cir. 2006) (quoting In re Oliver, 333 U.S. 257, 270 (1948)).  "'Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole.'" Thunder, 438 F.3d at 867 (quoting Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty., 457 U.S. 596, 606 (1982)).

> The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.

Waller v. Georgia, 467 U.S. 39, 46 (1984) (quotations omitted); accord Estes v. Texas, 381 U.S. 532, 588 (1965) (Harlan, J., concurring) ("Essentially, the public-trial

guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.").

Whether the right to a public trial under the Sixth Amendment attaches at sentencing is an issue that has not been specifically addressed by this court or the Supreme Court. However, it is clearly established that the public trial right extends beyond actual proof at trial, Waller, 467 S. Ct. at 45, and can be invoked by the press and the public under the First Amendment, or the accused under the Sixth Amendment, Presley v. Georgia, 130 S. Ct. 721, 723 (2010) (per curiam).

To determine whether the Sixth Amendment right to a public trial attaches at sentencing, jurisprudence discussing the First Amendment right to a public trial informs the analysis.

> Of course, our First Amendment right of access cases do not directly control here, because this case concerns a criminal defendant's Sixth Amendment right to a public trial, and "[t]he extent to which the First and Sixth Amendment public trial rights are coextensive is an open question." Presley v. Georgia, 130 S. Ct. 721, 724 (2010) (per curiam). As the Supreme Court observed in Waller v. Georgia, 467 U.S. 39 (1984), however, precedents concerning the reach of the public's First Amendment right of access may inform the scope of the defendant's Sixth Amendment right to a public trial, because "there can be little doubt that the *explicit* Sixth Amendment right of the accused is no less protective of a public trial than the *implicit* First Amendment right of the press and public." Id. at 46 (emphasis added).

United States v. Rivera, 682 F.3d 1223, 1229 (9th Cir. 2012) (holding that the Sixth Amendment right to a public trial attaches to sentencing proceedings, in part, because the judge and prosecutor continue to bear grave responsibilities, both to the accused and to the broader community).

The Presley Court found it unnecessary, when speaking of the coexistence of the First and Sixth Amendments' public trial rights, "to speculate whether or in what circumstances the reach or protections of one might be greater than the other," but intimated that doing so would require a legitimate reason to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has. 130 S. Ct. at 724. Emphasizing that the accused's Sixth Amendment public trial right is not to be taken lightly, the Court reiterated that "'[o]ur cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant,'" and that "[t]here could be no explanation for barring the accused from raising a constitutional right that is unmistakably for his or her benefit." Id. (quoting Gannett Co. v. DePasquale, 443 U.S. 368, 380 (1979)).

Accordingly, we look to the Court's guidance to determine whether the Sixth Amendment public trial right attaches at sentencing. To do so, as informed by the Court's First Amendment public access jurisprudence, we must determine whether sentencing hearings are traditionally conducted in an open fashion, and whether public access operates to curb prosecutorial or judicial misconduct and furthers the public interest in understanding the criminal justice system. Press-Enter. Co. v. Super. Ct. of Cal. for the Cnty. of Riverside, 478 U.S. 1, 8 (1986). Stated differently, we turn our analysis to whether public access at a sentencing hearing plays a significant positive role in its functioning such that the Sixth Amendment right attaches. Id. at 8; see also Waller, 467 U.S. at 46-47 (holding that the interests and aims of the Sixth Amendment were no less pressing at suppression hearings, which often are as important as the trial itself).

Persuasive to the Waller Court, for example, was the fact that suppression hearings, like sentencing hearings, often resemble bench trials, where witnesses are sworn and testify, and of course, counsel argue their positions. And, just like sentencing hearings, "[t]he outcome [of suppression hearings] frequently depends on a resolution of factual matters." Waller, 467 U.S. at 47. These factors weighed

-6-

favorably in the Court's determination that "[t]he need for an open proceeding may be particularly strong with respect to suppression hearings." Id. Sentencing hearings have also historically been open to the public. United States v. Alcantara, 396 F.3d 189, 197 (2d Cir. 2005) (discussing the historical openness of sentencing hearings while analyzing the First Amendment right to a public trial); In re Wash. Post Co., 807 F.2d 383, 389 (4th Cir. 1986) (same). "Numerous cases from over a century ago describe sentencing proceedings held in open court." Alcantara, 396 F.3d at 197. Too, sentencing hearings are "trial like" in that witnesses are sworn and testify, factual determinations are made, and counsel argue their positions. "[T]he values of encouraging witnesses to come forward and discouraging perjury remain salient at sentencing, because the parties may present witnesses at sentencing." Rivera, 682 F.3d at 1228. These factors weigh favorably in our determination that the Sixth Amendment public trial right attaches at sentencing.

There are additional factors that inform our determination today regarding the accused's Sixth Amendment right to public access at sentencing. First, having noted that the jurisprudence addressing the public trial right in the context of the First Amendment informs our analysis; the Second, Fourth, Fifth, Seventh, and Ninth Circuits have held that the First Amendment public trial right applies at sentencing. Alcantara, 396 F.3d at 196-99; In re Wash. Post Co., 807 F.2d at 388-89; Hearst Newspapers, L.L.C. v. Cardenas-Guillen, 641 F.3d 168, 176 (5th Cir. 2011); United States v. Eppinger, 49 F.3d 1244, 1252-53 (7th Cir. 1995); see also CBS, Inc. v. United States Dist. Ct. for the Cent. Dist. of Cal., 765 F.2d 823, 825 (9th Cir. 1985) (holding that the public and press have a right of access to various documents filed in connection with sentencing proceedings). In juxtaposition with these holdings, as noted earlier, the Supreme Court has made clear that the public trial guarantee was a special-protection right created for the benefit of the defendant, see Presley, 130 S. Ct. at 724, and thus it would seem axiomatic that the accused at the very least has an equal Sixth Amendment right to public access at sentencing. As is the case in the context of juror selection proceedings, "there is no legitimate reason [in the context

of sentencing hearings] to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has."  Presley, 130 S. Ct. at 724.

Second, highlighting the importance of sentencing hearings generally, the Supreme Court has held that "sentencing is a critical stage of the criminal proceedings at which [a defendant] is entitled to the effective assistance of counsel."  Gardner v. Florida, 430 U.S. 349, 358 (1977); see also Mempa v. Rhay, 389 U.S. 128, 134, 137 (1967) (recognizing the "critical nature" of sentencing in criminal proceedings such that the right to counsel attaches).  Some courts, in the First Amendment public trial access analysis, have further held that, in fact, sentencing is so integral to the trial process that it is certainly contemplated by the constitutional language.  These courts deduce that the Supreme Court's determination that there is a First Amendment right of access at trial, logically applies to sentencing because the latter is wholly contemplated by the former.

> "Sentencing may . . . be viewed as within the scope of the criminal trial itself.  Sentencing can occur before the termination of the trial proceeding, and, even if it occurs in a separate hearing, it clearly amounts to the culmination of the trial.  Moreover, even if . . . sentencing hearings are not considered a part of the trial itself, they are surely as much an integral part of a criminal prosecution as are preliminary probable-cause hearings, suppression hearings, or bail hearings, all of which have been held to be subject to the public's First Amendment right of access."

Alcantara, 396 F.3d at 196-97 (quoting In re Wash. Post Co., 807 F.2d at 389).  While these holdings are not determinative in our instant analysis, they inform our conclusion that the Sixth Amendment public trial right attaches at sentencing.

In light of the First Amendment public trial access jurisprudence, the emphasis by the Supreme Court that the right was created specifically for the benefit of the accused, the Supreme Court's reminder regarding the critical nature of sentencing hearings themselves, and, most importantly, our conclusion that public access at a sentencing hearing plays a significant positive role in its functioning and furthers the benefits sought to be afforded the accused under the Sixth Amendment, we hold that the Sixth Amendment right to public access attaches at sentencing. Accordingly, we move on to determine whether the district court, in this instance, violated that right.

The Sixth Amendment right to public access is, however, not absolute. And, we review the district court's ruling to close the courtroom under an abuse of discretion. United States v. Farmer, 32 F.3d 369, 371 (8th Cir. 1994). The right must "give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Waller, 467 F.3d at 45. In rare circumstances, when complete closure is contemplated,

> [t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

Id. (quotation omitted).

In order to completely close a trial or similar proceeding,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider

-9-

reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

Id. at 48.

However, "we have held that where the trial court orders only a partial closure, there need only be a showing of a 'substantial reason' for the partial closure, as opposed to Waller's 'overriding interest' requirement." United States v. Petters, 663 F.3d 375, 383 (8th Cir. 2011) (assuming for purposes of analysis that the district court's prohibition of the use of a witness's name during a pretrial proceeding was a partial closure), cert. denied, 132 S. Ct. 2417 (2012). Whether a closure is total or partial, according to this circuit's precedent, depends not on how long a trial is closed, but rather who is excluded during the period of time in question. Thunder, 438 F.3d at 868 (explaining that the exclusion of the members of the public and the press during a child victim's testimony is a total closure of the courtroom); Farmer, 32 F.3d at 370-71 (ordering all spectators other than the members of the victim's family from the courtroom during the balance of the victim's testimony was a partial closure); see also Woods v. Kuhlmann, 977 F.2d 74, 75-6 (2d Cir. 1992) (ordering all members of the defendant's family from the courtroom after the prosecutor informed the judge that a witness was terrified of retaliation from the family was a partial closure).

"The justification for this lower[, 'substantial reason'] standard is that a partial closure does not implicate the same secrecy and fairness concerns that a total closure does." Petters, 663 F.3d at 383 (internal quotations omitted). So, a partial closure does not rise to the level of a Sixth Amendment violation if: (1) there is a substantial interest likely to be prejudiced, (2) the closure is no broader than necessary to protect that interest, (3) the trial court considers reasonable alternatives to closing the proceeding, and (4) the trial court makes findings adequate to support the closure. Farmer, 32 F.3d at 371. Additionally, even though a trial court must make sufficient findings to allow the reviewing court to determine whether the partial closure was

proper, in this circuit, "specific findings by the district court are not necessary if we can glean sufficient support for a partial temporary closure from the record." Id.

In this case, the district court, noting the absence of press representation at the proceeding, reviewed its possible alternatives and cleared Thompson's family from the courtroom during Campbell's testimony, a partial closure. From the record, it is clear that Thompson's family members were the only people in the gallery who were not court staff. And, even though the district court did not make a thorough record articulating the substantial reason it contemplated prior to its partial closure, the record is sufficient for this court, on appeal, to do so. Having made such a review, we find no abuse of discretion by the district court.

The government's interest in protecting its witness and the witness's concern for his own safety justify the partial closing in this case. See Presley, 130 S. Ct. at 725 (recognizing that safety concerns and threats could certainly be concrete enough reasons to warrant closing a trial); see also United States v. Addison, No. 11-8105, 2013 WL 675240, at *4 (10th Cir. Feb. 26, 2013) (focusing on one reason alone–witness intimidation–because that reason by itself supports affirmance of a district court's partial closure). Detective Coates clearly laid out Campbell's expressed concern and nervousness about his safety and well-being should Thompson find out that Campbell had provided the information. That the district court did not hear of Campbell's fears from Campbell's own lips is of no concern. The court had the information. Too, the courtroom was not cleared until Campbell, the last witness, testified. Because the only people asked to leave were Thompson's family members, and given the evidence of Campbell's fear of testifying in their presence, the closure was no broader than necessary and we can think of no other alternatives based on this record that would lead us to conclude that the district court abused its discretion in this regard.

Considering the record before the district court, which laid out Campbell's expressed fear of testifying against Thompson, an alleged gang member involved in a drive-by shooting, who was implicated in other gang-related, violent activities by other witnesses; we find no abuse of discretion in the court's conclusion that Thompson's family should be excluded from the courtroom during Campbell's testimony. See Addison, 2013 WL 675240, at *4 (collecting cases that have upheld closure to protect testifying witnesses).

## III.  CONCLUSION

For the forgoing reasons, as noted at the outset, we find no constitutional infirmity in the district court's sentencing of Thompson.  Accordingly, we affirm.

GRUENDER, Circuit Judge, concurring.

I write separately because although I would affirm the district court's decision to order a partial closure, I would recognize Thompson's constitutional right to a public sentencing under the Fifth Amendment, rather than the Sixth.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."  Thompson argues, and the Court today apparently agrees, that sentencing is a phase of "trial" as the word is used in the Sixth Amendment.  The Supreme Court has only "assume[d] arguendo that sentence is part of the trial for purposes of the Sixth Amendment." *Pollard v. United States*, 352 U.S. 354, 361 (1957) (holding that assuming petitioner had a Sixth Amendment right to a speedy sentencing, the right was not violated).  The Supreme Court has, however, observed that "a prosecution terminates only when sentence is imposed." *Bradley v. United States*, 410 U.S. 605, 609 (1973).  Sentencing

proceedings, then, may comprise the latter phase of "all criminal prosecutions," but are they part of a "trial"?[2]  I conclude they are not.

"The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning . . . ."  *United States v. Sprague*, 282 U.S. 716, 731 (1931).  The Second Circuit Court of Appeals recently provided a thorough analysis of the relationship between sentencing and trial at the time of the nation's founding.  *See United States v. Ray*, 578 F.3d 184, 195 (2d Cir. 2009).[3]  In particular, the *Ray* court observed that Sir William Blackstone, whose writings exerted considerable influence on the Founders, distinguished between trial and sentencing.  Blackstone's Commentaries discuss the processes for adjudicating guilt or innocence in a chapter entitled "Of Trial and Conviction," while a subsequent chapter, "Of Judgment and Its Consequences," "consider[s] the next stage of criminal prosecution, after trial and conviction are past."  *Id.* at 195 (quoting 4 W. Blackstone, Commentaries on the Laws of England 368 (1769)); *see also Apprendi v. New Jersey*, 530 U.S. 466, 478 n.4 (2000) ("'[A]fter trial and conviction are past,' the defendant is submitted to

---

[2]The Supreme Court has recognized a Sixth Amendment right to effective assistance of counsel during sentencing.  *See supra* p. 8 (quoting *Gardner v. Florida*, 430 U.S. 349, 358 (1977)).  As the Sixth Amendment explains, "in all criminal prosecutions, the accused shall enjoy . . . the Assistance of Counsel for his defence."  Therefore that "sentencing is a critical stage of the criminal proceedings" triggering the attachment of the Sixth Amendment right to counsel, *Gardner*, 430 U.S. at 358, tells us nothing of whether sentencing is also part of a "trial," causing the right to a public proceeding to attach.

[3]The Second Circuit conducted its analysis in the context of an asserted Sixth Amendment right to a speedy, rather than public, sentencing.  Nonetheless, the vast majority of its work is directly applicable to the instant case.  In the context of the phrase "speedy and public trial," I see no reason to define the noun "trial" in one way when the adjective "speedy" modifies it and in another way when the adjective "public" modifies it.

'judgment' by the court, 4 Blackstone 368—the stage approximating in modern terms the imposition of sentence."). The Second Circuit also cited to early decisions of American courts, which similarly wrote of trial and sentencing as distinct phases of a criminal prosecution. *Id.* at 195-96.

Nor is such a bifurcated conception of trial and sentencing particularly alien to our modern understanding of these facets of criminal proceedings. For example, the Federal Rules of Criminal Procedure consider "Trials" in a series of rules separate and apart from the rules involving "Sentencing and Judgment." As the *Ray* court concluded, "[t]he structure of the Rules reflects an understanding that trials conclude with the announcement of a verdict of guilty or not guilty, and sentencing takes place after trial." *Id.* at 196. The Supreme Court has often described sentencing as a post-trial phase.[4] *See, e.g.*, *Lafler v. Cooper*, 558 U.S.---, 132 S. Ct. 1376, 1385-86 (2012)

---

[4]To be sure, the Supreme Court has sometimes, but not always, referred to the guilt and penalty "phases" of capital murder trials. *Compare California v. Brown*, 479 U.S. 538, 539 (1987) *and Estelle v. Smith*, 451 U.S. 454, 462-63 (1981) *with Deck v. Missouri*, 544 U.S. 622, 630 (2005) ("The considerations that militate against the routine use of visible shackles during the guilt phase of a criminal *trial* apply with like force to penalty proceedings in capital *cases*." (emphasis added)) *and Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). I do not interpret such references as proof that sentencing is necessarily a phase of a Sixth Amendment "trial." These remarks appear to be limited to capital cases, which generally involve uniquely "elaborate sentencing procedures . . . because of constraints [the Court] ha[s] said the Eighth Amendment places on capital sentencing." *Ring v. Arizona*, 536 U.S. 584, 606 (2002). As a result of these constraints, the Supreme Court has held that aggravating factors that serve as predicates for the imposition of the death penalty must be found by a jury, because they are "the functional equivalent of an element of a greater offense." *Id.* at 609 (quoting *Apprendi*, 503 U.S. at 494 n.19). Despite the Supreme Court's recognition that sentencing during a capital proceeding "in many respects resembles a trial on the issue of guilt or innocence," these similarities nonetheless do "not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial." *Spaziano v. Florida*, 468 U.S. 447, 458-59 (1984). Accordingly, in keeping with the absence of a Sixth Amendment right to a jury

("The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding. Its protections are not designed simply to protect the trial . . . . The precedents also establish that there exists a right to counsel during sentencing in both noncapital and capital cases." (internal citations omitted)); *Alabama v. Smith*, 490 U.S. 794, 801-03 (1989) (holding that "there is no basis for a presumption of vindictiveness where a second sentence imposed after a trial is heavier than a first sentence imposed after a guilty plea"); *Williams v. New York*, 337 U.S. 241, 246-47 (1949) (discussing "the historical basis" and "sound practical reasons" for "different evidentiary rules governing trial and sentencing procedures"). Furthermore, the Supreme Court already has implicitly concluded that sentencing is not part of a trial. Although the Sixth Amendment "right of trial by jury in criminal prosecutions" is well established, *Callan v. Wilson*, 127 U.S. 540, 550 (1888), "there is no Sixth Amendment right to jury sentencing," *McMillan v. Pennsylvania*, 477 U.S. 79, 93 (1986). If sentencing were subsumed within a Sixth Amendment "trial," these holdings would be irreconcilable.

Our colleagues on the Ninth Circuit Court of Appeals recently addressed this issue and, largely because they had already recognized a First Amendment right of access to sentencing proceedings, they interpreted the Sixth Amendment right to a public trial as also encompassing sentencing proceedings. *See United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012). In focusing on the benefits generated by a constitutional right to a public sentencing, the *Rivera* court adopted a similar analysis to the one the Court employs today. I find the *Ray* court's approach more persuasive for two primary reasons. First, as the Supreme Court has consistently explained, constitutional interpretation should be tethered to the common meaning

---

sentencing, the Court has held that the Sixth Amendment does not require a jury, rather than a judge, to impose the death penalty. *Id.* at 458-65; *see also Ring*, 536 U.S. at 612 (Scalia, J., concurring) ("What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so . . . .").

-15-

of the text at the time of the nation's founding, and such "interpretation will be adopted, whatever will be the consequences." *Briscoe v. Bank of Commonwealth of Ky.*, 36 U.S. 257, 282 (1837); *see also District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008). The *Ray* court, by focusing on the meaning of trial in use at the time of the nation's founding, is faithful to this instruction; in contrast, the *Rivera* court and the Court today largely rely on the consequences of their decision—namely the advantages that flow from the recognition of a Sixth Amendment right to a public sentencing—to justify their interpretation. Weighing attendant benefits is not the touchstone of this analysis. I do not dispute that although the benefits of a public sentencing, just like the benefits "of a public trial[,] are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real." *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984). Yet the distinction between "trial" and "sentencing" indicates there is no Sixth Amendment right to a public sentencing, and the creation of salutary benefits as a byproduct of recognizing a constitutional right should not sanction a strained reading of the word "trial."

Second, to the extent the Ninth Circuit and the decision today utilized the modern-day scope of the First Amendment right of access to court proceedings as a lens through which to interpret the scope of the Sixth Amendment's public trial provision, *see supra* pp. 6-8, I do not find their reliance to be conclusive. The First Amendment surely offers one among many useful clues to the contours of the Sixth Amendment. *See Presley v. Georgia*, 558 U.S. 209, 130 S. Ct. 721, 724 (2010). But it is not a decisive factor because, as this and other circuits have concluded, these two sets of rights are not, in fact, coterminous. The first four words of the Sixth Amendment constrain its application to criminal proceedings. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 386-87 (1979) ("In conspicuous contrast with some of the early state constitutions that provided for a public right to open civil and criminal trials, the Sixth Amendment confers the right to a public trial only upon a defendant and only in a criminal case." (footnote omitted)). Although the Supreme Court has yet to recognize a First Amendment right to attend civil proceedings, a majority of the

-16-

Justices have implied as much. *See Huminski v. Corsones*, 396 F.3d 53, 83 n.30 (2d Cir. 2004) (describing how "six of the eight sitting Justices" in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), "clearly implied that the [First Amendment right of access to courts] applies to civil cases as well as criminal ones"). The appellate courts have persistently amplified the First Amendment right of access well beyond the sphere of criminal proceedings. *See, e.g.*, *NY Civil Liberties Union v. NYC Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2011); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 700 (6th Cir. 2002); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984). For example, this court has "conclude[d] that the protection of the First Amendment extends to proceedings for contempt," *In re Iowa Freedom of Info. Council*, 724 F.2d 658, 661 (8th Cir. 1983), even though the Supreme Court has held that the Sixth Amendment does not guarantee public contempt proceedings, *Levine v. United States*, 362 U.S. 610, 616 (1960) ("Procedural safeguards for criminal contempts do not derive from the Sixth Amendment. Criminal contempt proceedings are not within 'all criminal prosecutions' to which that Amendment applies.").

Although the *Presley* Court pondered over "[t]he extent to which the First and Sixth Amendment public trial rights are coextensive," 130 S. Ct. at 724, the Court likely was mulling over the extent to which they partially overlap, rather than envisioning truly coterminous First and Sixth Amendment rights. Enforcing such a symmetry would be in great tension with the judiciary's trend toward recognizing a broad First Amendment right of access applicable to civil proceedings.[5] The *Presley*

_____

[5]Both the Ninth Circuit in *Rivera* and the Court today quote *Waller* for the proposition that "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Supra* p. 5. As discussed above, it has become almost *de rigeur* to view the First Amendment's right of public access as reaching beyond the Sixth Amendment's limitation to criminal prosecutions. Accordingly, the *Waller* Court's remark cannot mean what the Court today implies; namely, that if the public

-17-

Court did seem to view as axiomatic the proposition that, "at least in the context of juror selection proceedings," courts should not grant "one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has." *Id.* I interpret these comments as observing that if a member of the public has a First Amendment right to attend proceedings, then so, too, should the accused have a right to have the public present. The Court did not, however, command that this right be derived from the Sixth Amendment.

The notion that the public's First Amendment right of access is more expansive than the accused's Sixth Amendment right to public proceedings is less troubling than it initially may seem because the Constitution does not relegate the accused to relying solely on the Sixth Amendment to bring their rights into alignment with the rights of the general public. "[I]t is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. . . . The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence . . . ." *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality

---

has a First Amendment right of access to a particular proceeding, then the words of the Sixth Amendment must be stretched so as to accommodate an analogous right. There are only two ways for this contention to be true, and both options involve repudiating binding precedent. First, we could apply the public trial right in the civil context, thereby contradicting Supreme Court decisions such as *Levine* that limit the Sixth Amendment to criminal proceedings. Alternatively, we could contradict our own previous ruling in *In re Iowa Freedom of Information Council* and restrict the First Amendment right of access to criminal proceedings. In lieu of either choice, I interpret the comment as suggesting that the First and Sixth Amendment rights to a public "trial" (as the word is used in the Sixth Amendment) do overlap, without providing commentary on the extent to which they may enjoy broader symmetry. But harnessing the *Waller* Court's observation about a criminal accused's right to a public trial as proof of a Sixth Amendment right to a public sentencing begs the question of what exactly constitutes a "trial" under the Sixth Amendment.

opinion).[6]  Thus, I conclude that it is the dictates of due process under the Fifth Amendment, and not the Sixth Amendment, that bestow upon a federal criminal defendant the right to insist upon a public sentencing.  *Cf. Levine*, 362 U.S. at 616 (holding that, although the Sixth Amendment does not apply to contempt proceedings because they are not "criminal prosecutions," "due process demands appropriate regard for the requirements of a public proceeding in cases of criminal contempt"); *see also Deck*, 544 U.S. at 632 (holding that due process prohibits the routine practice of visibly shackling defendants in the presence of juries during sentencing proceedings); *Ake*, 470 U.S. at 83-84 (holding that when the State presents aggravating psychiatric evidence during a capital sentencing proceeding, the defendant has a due process right to the assistance of a psychiatrist).

Just as the Sixth Amendment right to public trial is not absolute, so too would the district court have discretion to determine whether the accused's Fifth Amendment right to a public sentencing must yield to legitimate state interests.  *Cf. United States v. Farmer*, 32 F.3d 369, 371-72 (8th Cir. 1994) (upholding under an abuse of discretion standard of review the district court's decision to partially close the courtroom because "the victim's age, the brutal nature of the offense and the victim's well-reasoned fear of [the defendant] and his family was more than enough to justify the decision").  A district court may order a partial or full closure of the court during sentencing but only if the court finds that factors particular to the sentencing justify such closure.  *Cf. Levine*, 362 U.S. at 616 ("Inasmuch as the petitioner's claim thus derives from the Due Process Clause and not from one of the explicitly defined procedural safeguards of the Constitution . . . [the existence of a due process violation] must turn on the particular circumstances of the case . . . .  The

---

[6]The *Gardner* Court further observed that simply because "due process applies [to sentencing] does not, of course, implicate the entire panoply of criminal trial procedural rights."  *Id.* at 358 n.9.  This distinction between the procedural due process required during sentencing and trial reinforces my conclusion that the two should not be conflated.

narrow question is whether, in light of the facts that the grand jury, petitioner and his counsel were present throughout . . . he was denied due process because the general public remained excluded from the courtroom."). In determining whether a defendant's due process rights were violated, the district court should consider the factors courts have traditionally relied upon in gauging the necessity of a closure, namely the *Waller* factors. *Cf. Deck*, 544 U.S. at 629. I agree with the conclusion that witness intimidation justified this partial closure of the courtroom during Thompson's sentencing. Accordingly, because Thompson's due process rights were not violated, I would affirm the sentence imposed by the district court.

———————————————